[No. 30376. *En Banc.* October 13, 1948.]

IRENE M. MARKLEY, *Respondent*, v. HARRY L. MARKLEY et al., *Appellants.*[1]

[1]Reported in 198 P. (2d) 486.

*Elliott & Schneider* and *H. W. Haugland*, for appellants.

*Rummens & Griffin, John Mills Day,* and *Kenneth P. Short,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment rendered in favor of respondent, and against appellants, in the sum of $7,181.77, being one half of the proceeds of the sale of real property located in the state of Kansas.

Irene Markley is the widow of James Markley, deceased. Harry Markley is the son and only living issue of James Markley and his wife by a former marriage. Olive Ames Markley is the son's wife. For convenience, we shall refer to the parties as James, Irene, Harry, and Olive. At the time in question, the parties all lived in Auburn, Washington.

On March 3, 1909, the heirs of Israel Markley deeded eight hundred acres of land in Morris county, Kansas, to James. The deed provided:

"To Have and to Hold the same together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining for and during his natural life only, and at his death to vest absolutely in his issue then living who shall share and share alike therein, and if he die without living issue then in such event said real estate shall revert to the living heirs at law of Israel Markley deceased, to share alike therein, provided that said James L. Markley shall pay all taxes to be assessed against said real estate during his natural life and shall have no authority to sell, mortgage, encumber or in any wise dispose of said real estate or any part thereof."

It was recorded July 19, 1909.

James' first wife died in 1918, and he married Irene in 1923. The relationship of the father and son and their wives was very cordial. They visited each other frequently and discussed family problems without restraint. James was worried about the Kansas land and would mention his concern during these visits. The property was rented but was not bringing much revenue. In January, 1938, he was given a power of attorney by Harry and Irene to sell this land, for they were all in need of money; he raised some money and took a trip to Kansas. There he was advised by an attorney that, if he would deed this land to another and receive a deed back, the life estate would be wiped out and he would have a clear fee title.

On January 24, 1938, James L. Markley and Irene M. Markley deeded the eight hundred acres to Benjamin F. Markley, his brother; on the same day, Benjamin and wife deeded back to James. Both deeds were recorded January 28, 1938.

James returned home and reported to his family that the title was now clear in him. March 24, 1938, he executed his will, leaving real and personal property in King county, and real property in Grant county, to his wife. The will also provided:

"I also declare that I own in fee simple the S ½ of Section 19, the SW ¼ of Section 20, and the N ½ of Section 30, all in Twp 17, So., of Range 7E of the 6th P.M., in Morris County, Kansas.

"THIRD: I give, devise and bequeath to my son Harry L. Markley and to my wife, Irene M. Markley, the eight hundred (800) acres of land in Morris County, Kansas, described in the preceding paragraph, to each an undivided one half (½) share."

About a year later, they decided to sell the Kansas property to the tenant for a consideration of twelve thousand dollars, and a deed was executed by James and Irene to the purchaser. It was then disclosed that, because of the deed of 1909 giving James a life estate, he could not give a good title. Attempts were then made to get all of the original grantors to execute a deed to the purchaser, but some

of the grantors refused to join, and the sale was not consummated. Nothing further was done about this land until James' death.

James died August 19, 1941. A few days later, Olive took Irene to the office of Chas. A. Cave, an attorney at Auburn, for the purpose of offering the will for probate. Mr. Cave had represented James for some time, had advised him in the attempted sale in 1939, and had prepared and witnessed his will. Olive testified that, as Mr. Cave was reading the will, when he came to the part concerning the Kansas land, he said, "This is out, this goes to Harry direct"; that he went on to explain that, when James could not give title to the property, he could not will it to someone; and that Irene said that she understood. Irene denied that this conversation took place.

At any rate, the petition for probate of will was filed August 29, 1941. The petition alleged that James left estate in King county of the probable value of fifteen hundred dollars, leaving Irene and Harry as his heirs, and that Irene was entitled to all of the property. The will was admitted to probate August 29, 1941. September 30, 1941, there was filed a petition to set aside in lieu of homestead, and October 10, 1941, the court entered an order setting aside to Irene, personal property, real property in King and Grant counties, all of the value of twenty-two hundred dollars, and discharging Irene as executrix.

Harry testified that he first learned of the will when Olive told about Irene bringing it to Mr. Cave for probate. Olive testified in regard to the conversations in the family concerning the sale in 1939:

"Q. In regard to these conversations, was there any great anxiety or desire to sell it by James or Irene Markley expressed? A. Well, we were all anxious to sell it. Father Markley said he would clear our debts at the same time he took care of his half. In fact, he practically said he would turn half of it over to us to take care of it. MR. GRIFFIN: I object to what a man "practically" said. THE COURT: It will be stricken. Q. In substance, what did he say would be done with the proceeds? A. He was going to pay off our debts out of the proceeds of this ranch. Q. After you ob-

tained these various deeds from the other Markleys,—they were children or grandchildren of Israel Markley,—I understand that you obtained several deeds? A. I think he obtained deeds from all the children but one brother had died in the meantime and his children refused to sign. Q. Did your husband, Harry Markley, assist in trying to obtain these various deeds for James Markley? A. I don't know just what he did to assist but he did whatever was asked or required of him because he was trying to make the sale, too."

When we consider that the two families freely discussed their mutual problems; that Harry and Olive gave James a power of attorney before he went to Kansas; that James said he would clear Harry's debts "at the same time he took care of his half"; we are convinced that Harry knew of the existence of the will and understood its terms, and there was an understanding between Harry and his father that each would receive half of the proceeds of any sale.

The record is silent as to any conversations between the parties concerning their interests in the property after the sale failed to materialize. Harry testified that, after his father's death, Irene brought the papers in connection with the Kansas property, and said, "Harry, here are the papers for your Kansas ranch. I hope you can do something with it, Dad was unable to." In the spring of 1942, Harry contacted attorney Cave in regard to a sale of the Kansas property and gave him all papers that he had in connection with it. Mr. Cave then drove to Kansas and contacted a bank and later a real-estate agent concerning the sale.

On May 26, 1942, there was filed in the probate court of Morris county, Kansas, "In the Matter of the estate of James L. Markley, deceased," the petition of Harry L. Markley, praying that an authenticated copy of the will of James L. Markley be admitted to probate. Attached to the petition were the following authenticated records from King county, Washington: last will and testament of James L. Markley; petition for probate of will; order admitting will to probate; petition for award in lieu of home-

stead; decree awarding property to surviving wife and closing estate.

The petition alleged:

"Petitioner further alleges that said decedent died the owner of certain real estate lying and situate in Morris County, Kansas, described as follows, to-wit:

"The North one-half (N ½) of Section Thirty (30) and the South one-half of Section Nineteen (19), and the Southwest one-quarter (SW ¼) of Section Twenty (20), all in Township Seventeen (17) South, Range Seven (7) East.

"And that said real estate was disposed of by said decedent under the terms, conditions, and provisions of his said Last Will and Testament.

"Petitioner further alleges that he is interested in said estate as a beneficiary under the terms of the said Last Will and Testament.

"Petitioner further alleges that no administration of this estate in the State of Kansas is necessary.

"WHEREFORE, Petitioner prays that the authenticated copy of Said Last Will and Testament of said decedent be admitted to Probate and Record, and the Court determines that no administration of this estate in this state is necessary; and that Harry L. Markley and Irene Markley, widow of James L. Markley, deceased, be declared the sole beneficiaries under the Will, and owners of the above described land.          Bert W. Strnad, Att'y for Petitioner.

"STATE OF KANSAS, COUNTY OF SALINE, ss:

"I, Bert W. Strnad, of lawful age, and after being first duly sworn, do hereby solemnly swear and affirm that I am the true and lawful attorney in fact for Harry L. Markley, the foregoing Petitioner, and that the said Harry Markley is absent from the State of Kansas and is a resident of Auburn, King County, State of Washington.

"I further swear and affirm that I have read the foregoing petition for the admission of the last will and testament of James L. Markley, Deceased, to Probate and Record and that the facts and allegations therein contained are true and correct, so help me God.      Bert Strnad, Affiant"

On May 26, 1942, the probate court of Morris county, Kansas, admitted the foreign will to probate and ordered that it was not necessary to have an administration upon the estate in the state of Kansas.

On May 25, 1942, the inheritance tax division, state of Kansas, issued an order No. 110685, in the "Estate of James L. Markley, county of King, Washington." The order listed the Kansas real property, valued at fifteen thousand dollars. The order stated:

"From the evidence filed it is determined that the property passes in shares as follows:

| Name | Relationship | SHARE—less than exemp- |
|------|-------------|------------------------|
| Irene M. Markley | Widow | tion allowed or less |
| Harry L. Markley | son | than minimum tax base. |

REMARKS: A certified copy of this finding is issued herewith in order that it may be recorded in Morris County by the parties in interest."

A deed, dated March 28, 1942, from Harry L. Markley and Olive Ames Markley, husband and wife, and Irene M. Markley, a widow, to Florence R. Koger, and acknowledged May 12, 1942, before Chas. A. Cave, was recorded in Morris county, Kansas, June 9, 1942. The same day, June 9, 1942, the Farmers and Drovers Bank of Council Grove, Kansas, issued a draft in the amount of $14,363.55 to Harry L. Markley, Olive Ames Markley, and Irene M. Markley. The draft was mailed to Harry; he and Olive endorsed it; Olive then took it over to Irene, who endorsed it. It was then cashed and the proceeds placed in the account of Harry and Olive Markley.

Harry testified that he never saw the petition filed in probate court in Kansas, until a week before the trial; that he did not know the attorney down there; and that he never signed a similar petition. We do not believe that it would be possible for him, knowing all the past ramifications in connection with the attempted sale of the land, having turned over all papers to Mr. Cave for the purpose of a sale, having executed a deed jointly with Irene, and having received a draft made out to Irene and himself jointly, not to have any knowledge of the probate proceedings in Kansas. He set in motion the events which resulted in the passing of clear title to Florence R. Koger. He received the benefits of such transaction, and, from the facts, we assume that he knew all about it.

It is rather difficult to ascertain the true facts from the oral testimony, because this came from interested witnesses and was obviously biased. Irene would have us believe that there was a fiduciary relationship existing between Harry and herself, due to her age (she was seventy-seven at the time of trial) and physical condition. During the trial, she conducted herself with considerable skill in parrying with opposing counsel. After the property in the King county estate had been set aside to her, she sold her home in Auburn for twelve hundred dollars, conducting negotiations herself. She then turned the twelve hundred dollars over to Harry, without the "scratch of a pen." It was intimated in cross-examination that this was done in order that she might continue to receive an old-age pension, but this fact was not established.

Harry took the twelve hundred dollars and placed it in his own account. It was the same account in which he later placed the $14,363.55, the proceeds of the draft. With this money he bought a lot, from the city of Auburn, for Irene. The deed to her was dated November 18, 1941. He did not record the deed, and it was still on his desk in 1944 when Mr. Day, her attorney, demanded it. He made arrangements with a contractor to build a house on the lot and paid for the building, from time to time, out of the twelve hundred dollars. In 1943, he bought a car for her; this was after the draft had been received. It was agreed that she was to deed him the Columbia river land, in Grant county, as payment for the car. It is contended that she would not make such an arrangement if she actually had a half interest in the proceeds of the draft. However, such a deal could have been made, if the terms were satisfactory to both parties.

The trial court held that James had a life estate in the Kansas property, and that, at his death, title vested in Harry. We are in accord with the court's holding.

The trial court also concluded:

"That due to the fiduciary relationship existing between the parties and the use made by the defendants of the last Will of the deceased in establishing title in Kansas Court, as same was established, and in requiring plaintiff in the

manner required to join in the execution of the warranty deed with the warranties that she was required to assume, defendants are estopped by their conduct and estopped in law and by judicial decree from contending that plaintiff is not entitled to a one half interest in the Kansas property and the proceeds from the sale thereof, and plaintiff is entitled to judgment against defendants, and each of them, and their marital community in the sum of $7,181.77 with interest at six percent per annum from the 30th day of June, 1942, together with her costs and disbursements herein."

Equitable estoppel is defined in 3 Pomeroy's Equity Jurisprudence (5th ed.) 189, § 804:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

Under the title, Estoppel, 19 Am. Jur. 650, § 50, it is said:

"Generally speaking, a party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action. As has already been pointed out, this rule is sometimes said not to be strictly one of equitable estoppel, but rather one of quasi estoppel by election. However, since it is, at least, very closely analogous to estoppel and is customarily so designated and since the cases in which it arises often involve all the elements of estoppel in pais in the strictest sense of the term, it seems proper to consider it at this point. This principle operates to preclude one who prevents a thing from being done from availing himself of the nonperformance which he has himself occasioned. Further illustrations of the operation of the rule will be found throughout the entire article. In numerous cases, however, the courts have refused to hold that a party who had assumed one position was estopped from subsequently assuming another claimed

to be inconsistent therewith, basing such refusal on the ground that the two positions were not in fact inconsistent or that for some other reason the change of position was not inequitable or unjust either generally or as against the party asserting the estoppel."

"The rule that a party will not be allowed to maintain inconsistent positions is applied in respect of positions in judicial proceedings. As thus applied it may be regarded not strictly as a question of estoppel, but as a matter in the nature of a positive rule of procedure based on manifest justice and, to a greater or less degree, on considerations of orderliness, regularity, and expedition in litigation. Certainly the elements of reliance and injury, while often considered, do not enter into such so-called estoppel to the same extent that they do in equitable estoppel proper. The principle requiring consistency in judicial proceedings is, however, customarily considered a form of equitable estoppel, and, therefore, it seems proper to discuss it here in a general way, although for an exhaustive treatment reference must be had to other articles dealing with the particular matters out of which the estoppels arise.

"The doctrine of estoppel, by having assumed a certain position in a judicial proceeding, is to be distinguished from what is known as election of remedies. Both are bottomed upon estoppel, but an election of remedies upon a given state of facts is quite different from an estoppel growing out of the assertion at one time of a given state of facts and, when unsuccessful, an assertion at a subsequent time of another and entirely different and inconsistent state of facts. There may be an election of rights as distinguished from an election of remedies.

"The rule against inconsistent positions applies generally to positions assumed not only in the course of the same action or proceeding, but also in proceedings supplemental thereto, including proceedings for review or retrial, and even in separate actions or proceedings involving the same parties and questions." 19 Am. Jur. 704, Estoppel, § 72.

"A number of limitations upon, or qualifications of, the rule against assuming inconsistent positions in judicial proceedings have been laid down. Thus, the following have been enumerated as essentials to the establishment of an estoppel under the rule that a position taken in an earlier action estops the one taking such position from assuming an inconsistent position in a later action: (1) The inconsistent position first asserted must have been successfully

maintained; (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; (4) the parties and questions must be the same; (5) the party claiming estoppel must have been misled and have changed his position; (6) it must appear unjust to one party to permit the other to change. The courts are not altogether agreed, however, as to the application of some of these limitations. Clearly, to give rise to an estoppel, the positions must be not merely different, but so inconsistent that one necessarily excludes the other. There is considerable authority for the rule that estoppel against such a change of position is dependent upon success in maintaining the original claim, but there is also authority to the contrary, especially in cases where the action of the party amounts to an election of rights as distinguished from an election of remedies. Likewise, the rule that a judgment must have been rendered is generally held not to apply in cases where the right set up in a subsequent suit, as distinguished from the mere remedy, is inconsistent with that set up in the former suit. Similarly, although it is well settled in most jurisdictions that the rule that the taking of a position in one judicial proceeding precludes the taking of an inconsistent position in a subsequent one does not apply ordinarily to suits in which the issues and the parties are not the same, there are some jurisdictions in which the rule is extended under some circumstances even to cases of this kind. Moreover, although the raising of an estoppel against assuming inconsistent positions in judicial proceedings is often made to depend in some degree upon whether the other party has been misled and induced to change his position, there is also authority that these elements are not so important in this connection as they are in ordinary equitable estoppel." 19 Am. Jur. 709, Estoppel, § 73.

In *In re Miller*, 26 Wn. (2d) 202, 173 P. (2d) 538, we held that, in guardianship proceedings for the estate of a mentally incompetent person, the divorced husband of the incompetent is estopped to attack an order confirming the sale of real estate which found that each of the parties had an undivided one-half interest in the property and ordered that the proceeds of the sale be divided equally between them, even though, in the divorce proceedings, the husband had been awarded the entire property, where it appears that the husband had instituted the guardianship proceed-

ings subsequent to the divorce, had executed with the guardian the contract of sale, and had for a period of a year acquiesced in the order and subsequent proceedings.

We do not mean to hold in this case that, merely because appellant presented his father's will to the probate court in Kansas, he is estopped from claiming ownership in the property and thereby denied the right to the full proceeds of the sale, if in fact respondent acquiesced in that method of procedure and agreed to assist him to the extent of signing the deed. But that procedure is a very strong indication that there was an agreement between the parties that the property would be considered as belonging to them jointly.

We do know that when, in January, 1938, James went back to Kansas with a power of attorney from Harry and Olive, and, upon his return, executed his will, giving the Kansas property to Irene and Harry, share and share alike, it was then considered that James and Harry were joint owners. We know that the following year, when they decided to sell, James was to get half of the proceeds and Harry half. Had that sale gone through, upon the deed of James and Irene, and James had decided to keep all of the proceeds, he would have been estopped to deny the agreement he had with Harry.

Of course, after the sale failed to materialize, and it then appeared that James had only a life estate, and, upon his death, the title would vest in Harry, the parties might have then decided to abrogate the previous agreement, and if, when Harry decided to sell, he had commenced action in Kansas to quiet his title by virtue of the 1909 deed, we could then hold that the agreement between Harry and his father had been abrogated. However, instead of commencing an action in Kansas to quiet title, we find a deed, dated March 28, 1942, and acknowledged May 12, 1942, from Harry L. Markley and Olive Ames Markley, husband and wife, *and Irene M. Markley, a widow*, to Florence R. Koger, the purchaser. If an action to quiet title had been contemplated, the deed would have been executed *only* by Harry L. Markley and wife. The preparation of the deed including

Irene M. Markley as a grantor, refutes the contention of appellants that the probate proceeding in Kansas, rather than a suit to quiet title, was at the insistence of the title company, and was .done without Harry Markley's knowledge.

Harry presented the will in Kansas, alleging that he and Irene were the owners; there was recorded an order of the inheritance tax division of Kansas showing that the property passed in shares to Irene and Harry; the deed was executed by Irene and Harry; and the draft issued to them both. All of this convinces us that, as between respondent and appellants, the original agreement of January, 1938, was still in effect; that respondent relied upon it when she endorsed the draft; and that appellants are now estopped to deny the effect of the Kansas proceedings.

The judgment is affirmed.

MILLARD, STEINERT, ROBINSON, SIMPSON, and JEFFERS, JJ., concur.

HILL, J. (dissenting)—For respondent to prevail in such an action as this, she had the burden of presenting convincing evidence to establish that she had somehow acquired a one-half interest, legal or equitable, in the Kansas property. I find no such evidence.

Charles A. Cave gave uncontradicted testimony that the probate proceeding in Kansas was at the insistence of the title company. The majority, in effect, says that that statement is refuted by the fact that Cave took to Kansas a deed in which respondent had joined as grantor; and that, consequently, it is to be inferred that Harry Markley knew there was going to be a probate proceeding in Kansas. Based on that knowledge, Harry is held to be responsible for the allegations contained in a petition for probate prepared, verified, and filed by an attorney who was employed either by the bank through which they were dealing or by the title company, and whom he never saw or knew. On those allegations, an estoppel is predicated.

Getting the signature of respondent on a deed before going to Kansas for the purpose of clearing title to the real

property, seems to me the careful and prudent thing to have done; but, even if it be conceded that the inference relied upon by the majority may be properly drawn from that circumstance, something more than a debatable inference should be required to establish the right of respondent to a half interest in the Kansas property, legal title to which, the majority concedes, vested in Harry on the death of his father, James Markley.

The burden of proof was on the respondent to establish her half interest in the Kansas real property. She did not produce the testimony of the Kansas attorney nor of any officer of the title company to disprove Mr. Cave's statement, if it be false, that the suggestion of probate proceedings came from the title company. She relies upon the debatable inference to which we have just adverted to prove the basic fact in her claimed estoppel, *i.e.*, that Harry had knowledge of the Kansas probate proceedings.

If he had such knowledge, there was nothing about the probate petition that would constitute an estoppel. Respondent did not rely upon it, did not change her position because of it, did not even know about it until it was discovered in the course of preparation for the trial of this case. The most that can be said is that the allegations of the petition for probate in Kansas are inconsistent with Harry's present position, *and with the fact* that, on the death of his father, title to the Kansas real property vested in him. Something more than an inconsistent position is required to constitute an estoppel, and something more than an inconsistent position was required to divest Harry of an undivided one-half interest in the real property and to vest it in respondent.

Although the majority opinion concludes with the words ". . . appellants are now estopped to deny the effect of the Kansas proceedings," the majority, earlier in the opinion, says that it does not mean to hold that

". . . merely because appellant presented his father's will to the probate court in Kansas, he is estopped from claiming ownership in the property and thereby denied the right to the full proceeds of the sale. . . . But that pro-

cedure is a very strong indication that there was an agreement between the parties that the property would be considered as belonging to them jointly."

I have no doubt that, when James was alive, it was agreed between Harry and him that, if the Kansas property could be sold, they would share jointly in the proceeds. James would have been giving up a life estate and Harry, his interest as a remainderman; there was a reason, a basis, and a consideration for such an agreement. I find no reason, no basis, no consideration for any such agreement between Harry and respondent after the death of James had vested the fee-simple title in Harry.

It will be remembered that, as pointed out by the majority, James had complicated the title to the Kansas real property by a conveyance from respondent and himself to his brother Benjamin, who had in turn deeded the property back to James, all of which was part of an abortive attempt to change the life estate of James into a fee-simple title. Had respondent refused to sign a deed to that property, a suit to quiet title probably would have been necessary. That, and no more, was the interest which she has been able, by this lawsuit, with the aid of the claimed estoppel based on the inferred knowledge, to parlay into an equitable one-half interest in the Kansas real property, or $7,181.77, being one half of the net proceeds of the sale of that property.

MALLERY, C. J., and BEALS, J., concur with HILL, J.

---

November 18, 1948. Petition for rehearing denied.