[No. 643-1.    Division One—Panel 1.    December 6, 1971.]

JOAN KIECKER et al., *Respondents*, v. PACIFIC INDEMNITY COMPANY, *Appellant*.

*DeGarmo, Leedy, Oles & Morrison* and *David L. Ashbaugh,* for appellant.

*Hilyer-Levinski,* by *Gale P. Hilyer, Jr.,* for respondents.

UTTER, J.—Defendant insurance company appeals from

an adverse judgment determining it to be liable for damages sustained to an airplane under a hull insurance policy. A $3,466.50 judgment was entered for plaintiffs.

This litigation had its genesis in a small plug which was used prior to each flight to drain sediment and condensation from the fuel tanks of a 1947 Navion airplane. On July 12, 1968, one Pieter Blood, a pilot and mechanic who had been working on the airplane, desired to take it up for a test flight. Blood had done some work on the retractable landing gear which had not been working properly and wanted to ascertain if it had been fixed. Since he was not familiar with the 1947 Navion, he requested Bruce Haskins, who owned and was familiar with a Navion, to pilot it on the test flight and at the same time check Blood out in the airplane.

Once aloft, after a careful preflight check, the landing gear was put down and then was put into the up position (*i.e.,* cycled). It was discovered that the gear was still not functioning properly. In an effort to ascertain what was wrong, or to correct it, the gear was cycled many times. Meanwhile, as indicated by a post-accident examination of the airplane, unknown to Haskins or Blood, the plug in the bottom of the fuel tanks had shaken loose, and fuel was steadily streaming out of the underside of the plane. Shortly thereafter, the engine quit and Haskins, after a fruitless attempt at restarting the engine, elected to force land the airplane in a blueberry patch where it suffered extensive damage.

The airplane was owned by the late husband of Mrs. Kiecker. After her husband's death, Mrs. Kiecker attempted to sell it. Mrs. Kiecker of San Diego, California, is the sister of Laverne Simmons of Seattle. Simmons, along with Albert Levinski and William Christie, both Seattle lawyers, expressed interest in jointly buying the airplane under a corporation to be formed and named Zero Happy, Inc. Pieter Blood was also to be given an ownership interest in return for doing work on the plane.

The airplane was flown to Seattle to be examined by the

buyers and checked out personally by Blood. Mrs. Kiecker had at that time tentatively been offered $4,500 for the craft, apparently on the condition that it checked out properly. Subsequent to the airplane leaving California, but prior to the crash, a petition and order confirming the private sale of the airplane for $4,500 was entered by the California court in probate proceedings. It does not appear that respondents were given notice of or were in any way parties to this proceeding. Mrs. Kiecker claimed the order was obtained by her attorney without her knowledge or consent.

After the airplane had been in Seattle for 2 weeks, but before the crash, Simmons, Levinski, and Christie put $4,500 in escrow with a Seattle attorney to placate Mrs. Kiecker's concern about the money and to show that they were "solid people." However, according to the testimony of all the buyers, the sale had not yet been finalized, as they were still in the process of checking out the mechanical soundness of the airplane. After the crash, the buyers took an assignment of Mrs. Kiecker's cause of action against the insurance company and released the $4,500 to her.

Appellant first contends the plane had been sold to Zero Happy, Inc. at the time of the crash and consequently no coverage was afforded the aircraft under the terms of the policy.[1] At the outset it should be observed that the transaction here involved is governed by the provisions of the Uniform Commercial Code, RCW 62A.2, because the subject aircraft is movable property. RCW 62A.2-102; RCW 62A.2-105(1). Under the code, a contract for the sale of goods may be made in any manner sufficient to show agreement, and a contract will not fail for indefiniteness because one or more terms are left open, if the parties intended to enter into a contract and if there is a reasonably certain

---

[1] The policy provided that no coverage is afforded "[t]o any aircraft subject to any lien, conditional sale, mortgage . . . not specifically declared and described in this policy." The policy also provided that no assignment of the policy should bind the company until its consent thereto was given.

basis for providing a remedy. RCW 62A.2-204. A sale occurs and ownership transfers in the traditional sense upon passage of the title under the provisions of RCW 62A.2-401. *See* RCW 62A.2-106. However, the risk of loss may pass to the purchaser prior to the time title passes. RCW 62A.2-509.

It is implicit in both RCW 62A.2-401 and RCW 62A.2-509 that neither the title nor risk of loss can pass prior to the time there is a contract of sale. Since the trial court could have found, and we think did find, no contract of sale was created, we need not decide whether it is the creation of a contract of sale, passage of title, or the shifting of the risk of loss that controls the existence of coverage under the insurance policy.

The trial court determined in its conclusions that the aircraft was owned by Joan Kiecker at all times relevant herein. No finding was made to support the conclusion. However, we may look to the record to ascertain the factual basis for the trial court's conclusion. *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 466 P.2d 515 (1970); *Todd v. Superior Court,* 68 Wn.2d 587, 414 P.2d 605 (1966). In his oral opinion, the trial judge indicated he did not think the parties had intended a final sale at the time of the crash. The court noted:

> The fact that Mrs. Kiecker was paid off by these three gentlemen without any demurrer or anything, is no indication that they had elected to purchase.
>
> This was a matter of a brother dealing with a sister and his two friends going along with him.

The court, in effect, found there was no contract of sale, and we think this is supported by substantial evidence. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

All parties to the prospective sale transaction testified the Navion was in the process of being checked out mechanically and that sale at the $4,500 price was contingent upon the plane receiving a clean bill of health. At the time of the crash, the landing gear was not then functioning properly and, according to Mr. Blood's testimony, such a

malfunction might cost $2,000 to correct. The testimony does not compel a finding that a contract of sale existed as a matter of law.

The policy provided that for coverage to be afforded, the plane should be piloted by a private or commercial pilot with a minimum of "1,000 hours logged solo flying time or pilot in command," or by any properly certified pilot in the course of his *employment* by a repair station "provided that such in-flight operations are solely in connection with inspections or repairs to be or that have been performed and are specifically authorized by a mechanic properly certified by the FAA to make said inspections and repairs."

It appeared from the evidence that Haskins, the pilot in command at the time of the crash, did not have 1,000 hours of flight time which he had logged. Appellant contends that Haskins was *not* flying the plane in the course of employment by Blood, but, rather, that Haskins was an independent contractor under the tests set forth in *Hollingbery v. Dunn*, 68 Wn.2d 75, 411 P.2d 431 (1966), and that consequently there was no coverage because the pilot did not qualify under any of the provisions of the contract.

There is, however, substantial evidence supporting the trial court's determination the pilot was qualified under the insurance policy. The trial court found Haskins flew the airplane on "behalf of" Blood, and, because of the finding that coverage was in effect at the time of the accident, this must be taken to mean the trial court found that Haskins was employed by Blood. Haskins flew the plane in return for use of Blood's tools and repair facility. Although the relationship does not accord neatly with the common understanding of either an employment or independent contractor relationship, we think the trial court could have concluded it most closely resembles an employment relationship as commonly understood, and as set forth in *Hollingbery*. The requirement of control must be realized in the case of a pilot because, as to flight operations, he necessarily has final and absolute authority. As to the remaining criteria, they, on balance, favor an employment relation-

ship. Consequently, we believe there is no question substantial evidence of an employment relationship exists.

██ However, even if there were no substantial evidence of an employment relationship, the trial court's determination that the policy covered the airplane at the time of the crash would still be proper. Insurance contracts are to be construed liberally in favor of the insured. *Davis v. North American Accident Ins. Co.*, 42 Wn.2d 291, 254 P.2d 722 (1953); *Hamilton Trucking Serv., Inc. v. Automobile Ins. Co.*, 39 Wn.2d 688, 237 P.2d 781 (1951). In the instant case, we do not think "employment" as used in the contract must take on the technical meaning given to that term for purposes of vicarious liability; if the contract were interpreted in this manner no coverage would be provided if a repair station contracted out test flying to an independent contractor. Neither policy nor common sense supports such a result, so we are constrained to view the policy most strongly in favor of the insured, and construe the reference to flight by a "properly certified pilot in the course of his employment by . . . a repair station," to encompass a pilot, whether an employee or independent contractor, flying the craft at the *instance* of a repair station for purposes "solely in connection with inspection or repairs." Such a construction, it seems to us, would be most consistent with the intent to provide coverage during test flights by repair facilities irrespective of the total number of hours the pilot in command had logged. While the plain, explicit language of the policy cannot be disregarded (*Davis v. North American Accident Ins. Co., supra*), we do not think that construing "employment" in its generic nonlegal sense, rather than in its technical legal sense, does so.

As a related matter, appellant contends the flight was not solely in connection with "inspections or repairs" since one of the purposes of the flight was to check Blood out in the aircraft. The court was entitled to infer that checking out Blood, the mechanic, in the airplane so he might pilot the craft on later test flights was solely in "connection with inspections and repairs."

■   It is argued that the assignment of Mrs. Kiecker's cause of action was invalid inasmuch as language in the policy prohibited an assignment of an interest in the policy without the company's consent endorsed on the policy. *Davis v. Oregon Mut. Ins. Co.,* 71 Wn.2d 579, 429 P.2d 886 (1967). While this may be proper law in some factual circumstances, it does not apply to this case. After a loss has occurred and rights under the policy have accrued, an assignment may be made without the consent of the insurer, even though the policy prohibits assignments. That assignment is not treated as a transfer of the policy itself, but rather as a chose in action. *Davies v. Maryland Cas. Co.,* 89 Wash. 571, 154 P. 1116, 155 P. 1035, 1916D L.R.A. 395 (1916), *rev'd on other grounds; Luger v. Windell,* 116 Wash. 375, 380, 199 P. 760, 37 A.L.R. 641 (1921); 7 J. Appleman, Insurance, Law & Practice § 4269 (1962); G. Couch, Insurance § 63.2 (2d ed. 1966).

■   It is also urged by appellant that the order confirming the sale of the plane by the California court in the public proceedings should be recognized by Washington, given full faith and credit and held to be res judicata as to all matters raised or which could have been raised in the California proceedings. The flaw in this argument is that respondents were not parties to the California action. The rule that a party is not permitted to maintain inconsistent positions into judicial proceedings assumes that the same party asserted the inconsistent positions. *Markley v. Markley,* 31 Wn.2d 605, 198 P.2d 486 (1948); *Mueller v. Garske,* 1 Wn. App. 406, 461 P.2d 886 (1969). A judgment is not res judicata nor is a party collaterally estopped by judgment in an earlier case if there is no identity or privity of parties in the same antagonistic relation as in the decided action. *Owens v. Kuro,* 56 Wn.2d 564, 568, 354 P.2d 696 (1960). The case cited by appellant to sustain his position, *In re Estate of Jaussaud,* 71 Wn.2d 87, 426 P.2d 602 (1967), does not support his position here. In *Jaussaud,* an attack was made upon a final decree of distribution in a probate matter by a litigant who was a party and whose attorney approved the

final decree. Under these circumstances, the court held he was bound by the decree. While our court has recognized that decrees of superior courts, exercising jurisdiction in probate matters, are to be accorded the same full faith and credit as judgments in law or decrees in equity, they have premised their action on the fact that the parties bound are parties to the probate proceedings. *Wagner v. Alderson*, 91 Wash. 157, 157 P. 476 (1916); *In re Estate of Rynning*, 1 Wn. App. 565, 462 P.2d 952 (1969). There is no such showing in this case, and the decree of the California court is of no effect as to respondents.

■ Appellant next contends it was error for the trial court to enter a declaratory judgment to the effect that Blood and Haskins were not negligent. The appellant had filed a third party complaint against Blood and Haskins alleging their negligence and seeking subrogation of appellant's liability, if any. At trial, the appellant took a voluntary nonsuit, and respondents then moved to amend the complaint to include a declaratory action to determine Blood's and Haskins' negligence. The motion was granted, and judgment was later entered declaring the pilots not negligent. It is contended by appellant the trial judge erred in allowing the complaint to be amended so as to pray for declaratory relief. However, a motion to amend a pleading or to seek additional relief is entrusted to the discretion of the trial court and will only be set aside for an abuse thereof. CR 15 (a); *Quackenbush v. State*, 72 Wn.2d 670, 434 P.2d 736 (1967); *General Indus., Inc. v. Eriksson*, 2 Wn. App. 228, 467 P.2d 321 (1970). We cannot say the trial judge abused his discretion in allowing the complaint to be amended, thus settling the dispute and avoiding the possibility of another lawsuit.

Finally, appellant asserts that it was error for the trial court to conclude the premium of $166.50 for the last 6 months of the policy's 1-year term should be refunded. However, we think there was substantial evidence establishing the date of sale after the crash, in July or August of 1968 (the date Mrs. Kiecker assigned her cause of action

and received $4,500), and that the policy, by its own terms, provided no coverage for the remainder of its term (roughly 6 months).

Respondents request damages be awarded them under CAROA 62 for appellant's "delaying tactics" and "obvious bad faith." An examination of the record fails to establish bad faith. *Garcia v. Moran,* 194 Wash. 328, 77 P.2d 988 (1938).

The judgment is affirmed.

HOROWITZ, C.J., and WILLIAMS, J., concur.