[Nos. 59944-1; 60237-9. En Banc. October 6, 1994.]

PUBLIC UTILITY DISTRICT NO. 1 OF KLICKITAT COUNTY, ET AL, *Respondents*, v. INTERNATIONAL INSURANCE COMPANY, ET AL, *Appellants*.

790

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins, Catherine W. Smith,* and *Howard M. Goodfriend; Hallmark Keating & Abbott,* by *Daniel F. Mullin,* for appellants.

*Johnson & Martens, P.S.,* by *Barry M. Johnson* and *Pamela M. Andrews; Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *Albert R. Malanca, Kenneth G. Kieffer,* and *Donald S. Cohen,* for respondents.

DOLLIVER, J. — These consolidated appeals arise from an insurance coverage dispute involving the Washington Public Power Supply System (WPPSS) bond default. The Defendants, International Insurance Company (International) and Industrial Underwriters Insurance Company (Industrial), appeal from a jury verdict awarding the Plaintiffs $13 million in liability insurance coverage and an assessment of over $6,500,000 in prejudgment interest. International and Industrial also challenge the trial court's attorney fee award of almost $2,800,000.

The Plaintiffs in these cases consist of 10 Washington public utility districts (the PUD's), several employees and commissioners of the PUD's who served on the WPPSS Board of Directors and Participants' Committee (the individuals), and the Washington Public Utilities Districts' Utility System (WPUDUS). WPUDUS, of which the PUD's are members, is an unincorporated association of public utility districts that formed a joint agreement to self-insure and to purchase additional insurance.

As is customary, WPUDUS arranged for insurance coverage in layers. WPUDUS provided the first $500,000 in coverage for claims against its members as part of its self-insurance agreement. During the years relevant to this appeal, 1981 and 1982, WPUDUS also had excess coverage under a primary policy issued by Transcontinental Insurance Company (Transcontinental) as well as under additional policies incorporating the terms of this primary policy issued by several insurers, including the Defendant companies, International and Industrial. Specifically, in 1981 WPUDUS obtained excess insurance coverage from Transcontinental for $500,000 for the period of January 31, 1981, to January 31, 1982. WPUDUS also purchased $3 million in excess coverage from Defendant International under the same terms and for the same period as the Transcontinental policy. In 1982 the Transcontinental policy was increased to $19,500,000, and WPUDUS obtained an additional layer of excess coverage from Defendant Industrial for $10 million "PER TERMS AND CONDITIONS OF UNDERLYING TRANS-

CONTINENTAL POLICY". The existence of this coverage is relevant because the PUD's incurred massive liability as a result of the termination of WPPSS Plants 4 and 5.

In March 1983, holders of the WPPSS bonds filed class action suits against the participating utilities and the individual commissioners and employees who were members of the WPPSS Participants' Committee or of the WPPSS Board of Directors for alleged securities law violations in connection with the termination of WPPSS Plants 4 and 5 and the sale of the bonds financing these projects. *See In re WPPSS Sec. Litig.*, 720 F. Supp. 1379 (D. Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir.), *cert. denied*, 113 S. Ct. 408 (1992).

In a related matter, on June 15, 1983, we held in *Chemical Bank v. WPPSS*, 99 Wn.2d 772, 666 P.2d 329 (1983), *aff'd on rehearing*, 102 Wn.2d 874, 691 P.2d 524 (1984), *cert. denied*, 471 U.S. 1065, 471 U.S. 1075 (1985), that certain utilities lacked the authority to form the "Participants' Agreement", which provided for the funding of WPPSS Plants 4 and 5. This holding, in part, provided a basis for liability in Multidistrict Litigation (MDL) 551.

In August 1983, 29 separate federal securities lawsuits, including those mentioned above, were consolidated by the Panel on Multidistrict Litigation into "MDL 551", a complex and unwieldy mass of litigation. *In re WPPSS*, 720 F. Supp. at 1384. The Federal District Court assigned to MDL 551 managed, supervised, and finally approved the settlement agreements reached in MDL 551, which totaled over $580 million for the bonds which had been issued in the amount of $2.25 billion. These settlements ultimately were determined to be fair, reasonable and adequate. *See Class Plaintiffs v. Seattle, supra.*

Transcontinental, as an insurer with potential liability in MDL 551, had initiated a declaratory judgment action in 1984 seeking to determine if its two policies (the primary policies incorporated into the Industrial and International policies in the present case) provided coverage for the claims asserted in MDL 551. In August 1988, we held that "both

[Transcontinental] policies provide coverage for officers, directors and employees in their duties as such for liabilities arising out of the WPPSS-related litigation." *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists. Util. Sys.*, 111 Wn.2d 452, 464, 760 P.2d 337 (1988). In February 1988, the MDL 551 court found the individuals were immune from liability, but found their immunity was waived to the extent they were insured from claims of the sort brought by the MDL 551 claimants. *In re WPPSS*, 720 F. Supp. at 1406. Under these rulings, the excess insurance carriers providing coverage based on the Transcontinental policies were implicated.

Settlement in the MDL 551 litigation was achieved in stages and involved several intermediate rulings by the court. As settlement progressed, the individuals were released from the MDL 551 litigation after negotiating a settlement under which they assigned a percentage of the face value of their insurance policies to the MDL 551 claimants and a smaller percentage to the PUD's, the individuals' employers. The PUD's subsequently negotiated a separate settlement with the MDL 551 claimants under which the PUD's (who are Plaintiffs in the present case) paid the claimants more than $90 million (substantially less than originally demanded by the claimants), and in exchange, the claimants assigned their percentage of the insurance proceeds they had received from the individuals to the PUD's (as a compromise for the lower cash amount). Thus, the MDL 551 claimants received firm settlement dollars and were alleviated from the burden of having to collect the insurance proceeds from the numerous excess insurers.

In March 1989, the Plaintiffs in this case filed the present action in state court to enforce the insurance contract so that the PUD's could recover under those policies. All of the insurers except International and Industrial settled prior to trial. Both International and Industrial, however, disputed coverage and refused to settle. International asserted that its policy did not provide coverage for the MDL 551 claims. Industrial conceded its policy provided such coverage, but argued along with International that the insureds had

improperly assigned the proceeds of the policies, had settled without consent of the insurers in violation of the coverage terms, and had improperly acquired the insurance coverage. The trial court granted partial summary judgment in the Plaintiffs' favor on these issues.

Because the trial court had resolved many of the issues of coverage on summary judgment, the only questions submitted to the jury were (1) whether the Plaintiffs knew before the effective date of the policies that there was a substantial likelihood of a bondholder suit; (2) whether the Defendants were prejudiced by insureds' failure to obtain their consent for the assignments of the policy proceeds; and (3) whether the directors, officers, and employees of WPPSS (the insureds) were acting within the scope of their employment when they served as members of the WPPSS Board of Directors or Participant Committee. On its special verdict form, the jury answered the first two questions "no" as to both Defendants and answered the third question "yes".

Based on these findings, the trial court enforced the MDL 551 settlement and awarded the Plaintiffs the face amount of the policies ($3 million against International and $10 million against Industrial) plus a total of $6,513,534.25 in prejudgment interest. The trial court also granted the Plaintiffs' request for an attorney fees award and awarded $2,198,599.22 in fees to Gordon, Thomas, Honeywell, Malanca, Peterson and Daheim; $399,768.09 to Johnson and Martens; $59,243 to Blair, Schaefer, Hutchison and Wolfe; and $114,042.91 to Garvey, Schubert and Barer.

International and Industrial appeal directly to this court both from the underlying judgment and from the award of attorney fees.

## I

First we must consider whether the policies at issue in this case provide coverage for the MDL 551 claims. Because the basis of liability in MDL 551 was alleged negligence of the individual Plaintiffs in this case, the Defendants' duty to pay is dependent on the existence of coverage for the individuals' acts.

There is no dispute that the underlying Transcontinental policy provides such coverage. The Transcontinental policy, issued on January 31, 1981, was amended on October 7, 1981, to include an errors and omissions endorsement. Endorsement 7 states that Transcontinental would indemnify WPUDUS for any amount for which an officer, director, or employee became liable while acting in the scope of his duties. The endorsement clearly applies retroactively to January 31, 1981, the beginning of the policy period. *See Transcontinental Ins. Co. v. Washington Pub. Utils. Dists. Util. Sys.*, 111 Wn.2d 452, 464, 760 P.2d 337 (1988).

Industrial concedes its policy, which became effective August 1, 1982, incorporates this error and omissions clause. International, while it concedes its policy incorporated the initial terms of the Transcontinental policy, however, argues its policy does not incorporate the errors and omissions endorsement, which was not added until several months after the International policy was written.

■ The interpretation of insurance policies is a question of law, and in construing the language of an insurance policy, a court must construe the entire contract together so as to give force and effect to each clause. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993), *opinion supplemented*, 123 Wn.2d 131, 865 P.2d 507 (1994); *Transcontinental*, 111 Wn.2d at 456. If the language of an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. *Transcontinental*, 111 Wn.2d at 456. Ambiguity exists if a policy provision on its face is fairly susceptible to two different but reasonable interpretations. *Transcontinental*, 111 Wn.2d at 456.

International's declarations contain these relevant provisions:

ITEM 4 UNDERLYING INSURANCE:

COMPREHENSIVE AUTOMOBILE AND GENERAL LIABILITY IN THE AMOUNT OF $500,000.00 EACH OCCURRENCE/AGGREGATE WHERE APPLICABLE PER TRANSCONTINENTAL INSURANCE COMPANY POLICY NO. SXP 3584198 WHICH IS EXCESS OF A

SELF-INSURED RETENTION OF $500,000.00 EACH OCCURRENCE, PER FORMS ON FILE WITH THE COMPANY.

ITEM 5 LIMIT(S) OF COVERAGE HEREUNDER:

EXCESS COMPREHENSIVE AND GENERAL LIABILITY IN THE AMOUNT OF $3,000,000.00 PART OF $4,000,000.00 EACH OCCURRENCE/AGGREGATE WHERE APPLICABLE EXCESS OF THE LIMITS SHOWN IN ITEM NO. 4, UNDERLYING INSURANCE.

FORMS ATTACHED: FM 101.2.302 (9/79) AND ENDORSEMENT NOS. 1 AND 2.

Clerk's Papers, at 237. The International policy also contains the following condition:

A. **Application of Underlying Insurance.** Except as otherwise stated herein, and except with respect to (1) any obligation to investigate or defend any claim or suit, or (2) any obligation to renew, the insurance afforded by this policy shall apply in like manner as the underlying insurance described in the Declarations.

Clerk's Papers, at 244.

International contends that the phrase "PER FORMS ON FILE WITH THE COMPANY" unambiguously refers to forms on file with International when the policy was issued, not to forms on file with Transcontinental. Because endorsement 7 was added later, it was never in International's files. Therefore, if "THE COMPANY" refers to International, the errors and omissions provision was presumably never incorporated into International's policy. International also points out the term "the company" is used several times in the policy and endorsement pages of the document clearly referring to International. The first paragraph of the policy designates International as "the Company named in the Declarations (a capital stock company, herein called the company)". Clerk's Papers, at 244. This designation, however, is first made in the policy and does not expressly apply to use of the term in the declarations.

The Plaintiffs contend this wording is ambiguous and should be interpreted in favor of the insureds. We agree with the Plaintiffs that the phrase "ON FILE WITH THE COMPANY" could reasonably refer to the last company men-

tioned, Transcontinental, whose name appears in the same sentence. The contested phrase here, thus, seems fairly susceptible to both suggested interpretations.

■   Because we agree there is an ambiguity, we must attempt to discern and enforce the contract as the parties intended. *Transcontinental*, 111 Wn.2d at 456.

> To determine the parties' intent, the court first will view the contract as a whole, examining its subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. If the court determines that the policy remains ambiguous even after its consideration of the extrinsic evidence, the court will apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning.
>
> Overall, a policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective.

(Citations omitted.) *Transcontinental*, 111 Wn.2d at 457. The trial court, after having considered the extrinsic evidence, found the phrase to be ambiguous.

Viewing the insurance contract as a whole, we agree. International points to testimony that it scrutinized the Transcontinental policy to determine precisely the extent of coverage before it agreed to incorporate the terms into its policy. It was then well aware that the terms of the Transcontinental policy expressly provided for amendment as long as the amendments were in writing and attached as an endorsement, as was endorsement 7. International could have, but did not, expressly exclude such endorsements from its coverage. Furthermore, the nature of International's policy as an additional layer of excess coverage suggests the parties intended it to provide the same coverage as the underlying Transcontinental policy.

Because the extrinsic evidence does not resolve the ambiguity, we construe the ambiguity in favor of the insureds. We hold the International policy incorporates Transcontinental's errors and omissions endorsement and affirm the trial court's summary judgment on this issue.

## II

As part of the settlement agreement in MDL 551, the individual Plaintiffs in this case assigned their percentage of the insurance proceeds to the MDL 551 claimants. *See In re WPPSS Sec. Litig.*, 720 F. Supp. 1379, 1406 (D. Ariz. 1989). Having reached partial settlement, the MDL 551 claimants continued to pursue settlement with the PUD's and finally reached an agreement in which the PUD's paid them cash and the MDL 551 claimants, in return, assigned their percentage of the insurance proceeds to the PUD's. *See In re WPPSS*, 720 F. Supp. at 1408. As a result of this exchange, the PUD's ended up with 100 percent of the insurance proceeds.

The no-assignment provision incorporated into the International and Industrial policies from the underlying Transcontinental policy provides that "[a]ssignment of interest under this policy shall not bind the Company until its consent is endorsed hereon[.]" International and Industrial argue that the assignments without their consent constitute a breach of this provision. Clerk's Papers, at 3637.

The Plaintiffs argue, however, that even though a policy specifically prohibits assignments, an assignment of a claim, a cause of action, or proceeds may nonetheless be valid if made after the events giving rise to liability have already occurred when the assignment is made. We agree and affirm the trial court's summary judgment on the validity of the assignments.

■■ The purpose of a no-assignment clause in an insurance contract is to protect the insurer from increased liability. After the events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity. The assignments in this case occurred long after the activities giving rise to liability.

Two Washington appellate court cases support the assertion that assignments after a loss are valid. *See Kiecker v. Pacific Indem. Co.*, 5 Wn. App. 871, 877, 491 P.2d 244 (1971) ("After a loss has occurred and rights under the policy have accrued, an assignment may be made without the consent of

the insurer, even though the policy prohibits assignments."); *Kagele v. Aetna Life & Cas. Co.*, 40 Wn. App. 194, 197, 698 P.2d 90 ("[I]t is well established that a claim by an insured against his insurer may be assigned to the injured party."), *review denied*, 103 Wn.2d 1042 (1985).

International and Industrial attempt to distinguish *Kiecker* and *Kagele* on the grounds the assignments in these cases were held to be valid without consent of the insurer because the insurers were in breach under the policies. However, their interpretation of *Kiecker* and *Kagele* is not entirely accurate. Despite the insurers' breaches, both courts rely on the fact that the assignments were made after the loss. The courts' reasoning is consistent with the prevailing rule.

> Although there is some authority to the contrary, the great weight of authority supports the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply to assignments before loss only, and do not prevent an assignment after loss[.] . . .
>
>  . . . .
>
>  . . . [T]he fact that a liability or indemnity insurance policy expressly prohibits an assignment without the consent of the insurer does not bar an assignment of the policy or right thereunder after the event has occurred by which liability under the policy is fastened upon the insurer.

(Footnotes omitted.) 16 Ronald A. Anderson, *Couch on Insurance* § 63:40 (2d rev. ed. 1983).

The Defendants argue that the only event giving rise to their liability under their policies would be a judgment or a settlement with their consent, neither of which had occurred when the assignments were made in this case. They contend, therefore, that this is not a case of postloss assignment. We disagree. The Defendants cannot deny that the policies were designed to cover acts· of the insureds occurring during the policy period or that it is ultimately these acts which give rise to the insurers' liability.

In this case, the events giving rise to liability in MDL 551 occurred during the policy periods, and the rights to the policy proceeds were not transferred until the case was litigated in federal court long after the events had occurred. In such a situation, the identity of the party holding the insur-

ance rights cannot increase the insurers' risk, and to this extent is irrelevant. We also reject the Defendants' argument that they have been victims of collusion between the insureds and the claimants in the MDL 551 settlement. The assignments of the insurance proceeds were made as part of a court-supervised settlement agreement. We affirm the trial court.

### III

We next consider whether the settlement of the MDL 551 claims is enforceable against the insurers when it was reached without their consent.

The International and Industrial policies each contain an identical voluntary payment clause which precludes settlement without the insurer's consent:

### CONDITIONS

3. Insured's Duties in the Event of Occurrence, Claim or Suit
. . . .
    (c) . . . The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, in the event that the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the Insured, the claimant and the Company, then the Insured may pay the amount of ultimate net loss to the claimant to effect settlement . . ..

Clerk's Papers, at 3931. Under the Conditions section, each policy also contains a "no action" clause, which limits the insurer's obligation to pay only the amount established by final judgment or by a settlement in which the insurer had participated:

5. Action Against the Company
    No action shall lie against the Company with respect to any one occurrence, unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay . . . shall have been finally determined either by judgment against the Insured after the actual trial or by written agreement of the Insured, the claimant and the Company. . . .

Clerk's Papers, at 3931.

The Defendants argue that the insured breached these provisions by settling with the MDL 551 claimants without

their consent. They urge that when an insured settles a claim in violation of such policy provisions, the insurer's duty to pay is extinguished.

First, there is no dispute that the insureds' settlement of the MDL 551 claims without the consent of their insurers triggered the no-action clause. We note, however, that the express terms of the voluntary payment clause do not seem to be implicated. At the point the settlement agreement was entered as a judgment in MDL 551, there had been no "ultimate net loss" as defined in the policies because there had been no judgment holding Industrial or International liable under the policies nor had there been a settlement to which they consented. In any event, we find that the insurers' duty to pay has not been extinguished because they have failed to show they were actually prejudiced by the settlement without their consent.

In *Oregon Auto. Ins. Co. v. Salzburg*, 85 Wn.2d 372, 377, 535 P.2d 816 (1975), we held that an insured's noncompliance with a cooperation clause releases the insurer from its responsibilities "*only* if the insurer was actually *prejudiced* by the insured's actions or conduct." The actual prejudice requirement has also been applied with regard to notice provisions. *See, e.g., Safeco Title Ins. Co. v. Gannon*, 54 Wn. App. 330, 336-37, 774 P.2d 30, *review denied*, 113 Wn.2d 1026 (1989); *Spangler v. Insurance Co. of N. Am.*, 17 Wn. App. 121, 128, 562 P.2d 635 (1977); *Pulse v. Northwest Farm Bur. Ins. Co.*, 18 Wn. App. 59, 60-62, 566 P.2d 577, *review denied*, 89 Wn.2d 1011 (1977).

█ Much like cooperation and notice clauses, a no-settlement clause contains a condition the insured must fulfill to create the insurer's obligation to pay under the policy. Such conditions designate the manner in which claims covered by the policy are to be handled once a claim has been made or events giving rise to a claim have occurred. They are clearly placed in policies to prevent the insurer from being prejudiced by the insured's actions. To release an insurer from its obligations without a showing of actual prejudice would be to authorize a possible windfall for the insurers.

*See Salzburg*, 85 Wn.2d at 377. Thus, we find an insurer cannot deprive an insured of the benefit of purchased coverage absent a showing that the insurer was actually prejudiced by the insured's noncompliance with conditions precedent such as those at issue in this case. *Cf. Time Oil Co. of N. Am. v. Cigna Property & Cas. Ins. Co.*, 743 F. Supp. 1400, 1416 (W.D. Wash. 1990).

The burden of showing the actual prejudice is on the insurer, and it is a factual determination. *Salzburg*, at 377. *See also Pulse*, 18 Wn. App. at 61-62 (insured's noncompliance with a notice clause raises a question of fact for the jury on issue of prejudice).

The Defendants urge that prejudice should be presumed in cases such as this. For this proposition they cite several cases from other jurisdictions which do not require a showing of actual prejudice. For example, in *In re Texas E. Transmission Corp.*, 15 F.3d 1249 (3d Cir. 1994), the court, interpreting Texas law, did not require the insurer to demonstrate actual prejudice and instead applied a lower standard and presumed that not having the opportunity to engage in negotiations with the Environmental Protection Agency (EPA) prejudiced the insurer. The court did not even require the insurer to show that had it been involved in the negotiations that would have led to a more advantageous result for the insurer. *Texas E.*, 15 F.3d at 1254-55. Another case relied on by the insurers discusses the difference between the actual prejudice standard and lower standards. *Stevens v. Merchants Mut. Ins. Co.*, 135 N.H. 26, 28, 599 A.2d 490 (1991). In *Stevens*, the appellant argued for the application of Massachusetts law. The court acknowledged that under Massachusetts law the insurer "would be required to show prejudice to its rights before the exclusion [a consent to settle] could be enforced." *Stevens*, 135 N.H. at 28. However, the court applied New Hampshire law, which does not require a showing of actual prejudice, and relieved the insurer of liability. *Stevens*, 135 N.H. at 30. Because Washington law requires a showing of actual prejudice, we do not find these cases persuasive.

The only Washington case Defendants cite in support of their argument that they have been prejudiced as a matter of law is *Felice v. St. Paul Fire & Marine Ins. Co.*, 42 Wn. App. 352, 711 P.2d 1066 (1985), *review denied*, 105 Wn.2d 1014 (1986). There, the court presumed prejudice from the insured's noncompliance with a timely notice clause because the delay deprived the insurer of an opportunity to investigate and evaluate the case prior to and during trial. *Felice*, at 360. The *Felice* court recognized, however, that "prejudice will be presumed only in extreme cases" and found, under the circumstances of the case, that actual prejudice to the insurer existed. *Felice*, at 359 (quoting *Pulse*, 18 Wn. App. at 62).

Regarding the issue of actual prejudice, we find the trial court correctly determined this case to present a question of fact. The facts of this case support a reasonable conclusion that neither International nor Industrial were prejudiced by the settlement without their consent, given the enormity of the overall liability in MDL 551, the relatively small portion covered by the Defendants' policies, and the fact that the court-supervised settlement was found to be fair and reasonable. *See In re WPPSS Sec. Litig.*, 720 F. Supp. 1379 (D. Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir.), *cert. denied*, 113 S. Ct. 408 (1992). We therefore hold the trial court correctly denied cross summary judgment motions on the issue of actual prejudice.

## IV

Next, Industrial challenges the trial court's application of the "known risk" defense. The known risk defense is premised on the principle that an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased.

Generally, courts applying the known risk principle (also referred to as the known loss principle) must determine whether a particular occurrence was expected by the insured before the insurance coverage was obtained. This is a question of fact. *See generally Insurance Co. of N. Am., Inc. v. U.S. Gypsum Co.*, 870 F.2d 148 (4th Cir. 1989); *Carter Lk.*

*v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052 (8th Cir. 1979); *Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F. Supp. 1400 (W.D. Wash. 1990); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1993).

Under this general rule, the trial court denied the Defendants' motion for summary judgment based on the known risk defense, leaving the determination to the trier of fact. The court instructed the jury as follows:

> The "known risk" principle only applies if you find that the insureds know that there was a substantial probability that they would be sued by the bondholders for securities violations at the time the Industrial policy was issued[.]

Clerk's Papers, at 1519 (instruction 22). On its special verdict form, the jury found the insureds did not have this knowledge. Clerk's Papers, at 1524. The Defendants argue that the instruction too narrowly defines the known risk defense doctrine, and they request that we reverse and remand for a new trial in which the jury receives a broader instruction.

Industrial essentially argues that if an insured has knowledge of any potential liability at the time the policy is issued, the insurer is no longer insuring for a contingency, but for a known risk and that such coverage should be denied. Specifically, Industrial asserts the insureds knew of the possibility of lawsuits and losses arising from the termination of WPPSS Plants 4 and 5 when they purchased the Industrial policy in July 1982. Industrial points to a report that was dated July 1, 1981, and circulated to the 88 utilities that participated in Plants 4 and 5, warning of potential liability.

Notwithstanding the report, the Plaintiffs assert they are entitled to collect under the insurance policies. They argue that coverage can only be denied under the known risk principle if they knew they could be subject not just to any liability, but to the same type of liability that eventually occurred. They maintain the individuals had no idea at the time the insurance was purchased they would be liable to bondholders for securities violations.

In *Time Oil Co. v. Cigna Property & Cas. Ins. Co., supra,* the insureds were notified by the EPA that they were a potential contributor to the hazardous materials contamination of a drinking water well and subsequently purchased insurance policies for liability arising from the contamination. *Time Oil,* 743 F. Supp. at 1413. The court held that there was no coverage under the policy because the process causing the loss had already begun and Time Oil knew with "substantial probability" when it purchased the coverage that it would have to pay EPA and city response costs relating to the contamination. *Time Oil,* 743 F. Supp. at 1414-15.

Likewise, in *Outboard Marine Corp. v. Liberty Mut. Ins. Co., supra,* the insured had been notified by the EPA that its discharge of PCB's was hazardous and posed an imminent and substantial danger to those utilizing the waters of Lake Michigan. *Outboard Marine,* 607 N.E.2d at 1210-11. The court found that the subsequently purchased insurance policy did not provide coverage because Outboard Marine possessed "knowledge of a substantial probability that claims would be made against it for PCB pollution . . .." *Outboard Marine,* 607 N.E.2d at 1211.

The courts in both *Outboard Marine* and *Time Oil* denied coverage because the insureds possessed knowledge regarding the type of liability they faced when they purchased insurance. In the present case, however, the insureds had no knowledge when they purchased the coverage from Industrial in June 1982 that they would be subject to liability for securities violations. It was not until this court ruled on June 15, 1983, that the municipal corporation utilities did not have legal authority to enter into the Participants' Agreement in *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983), *aff'd on rehearing,* 102 Wn.2d 874, 691 P.2d 524 (1984), *cert. denied,* 471 U.S. 1065, 471 U.S. 1075 (1985), that any legitimate basis for liability even became apparent.

The present case is more analogous to *Insurance Co. of N. Am. v. U.S. Gypsum Co., supra,* in which the insurer attempted to avoid liability under its policy for damage caused by ground subsidence. The insurer argued that the

insured knew with certainty when it purchased the insurance that some subsidence was likely to occur. *Gypsum*, 870 F.2d at 151. The court found the insured did not have the requisite knowledge to invalidate the policy and held the policy provided coverage for the loss, stating "there is a fundamental distinction between the certainty of subsidence and the certainty of resulting loss". *Gypsum*, 870 F.2d at 152.

██ The knowledge that some loss may occur in the future is the driving force behind the purchase of insurance. A finding that this general knowledge precludes coverage would be much too broad. The trial court's instruction is consistent with the accepted application of the known risk defense, and we find no error.

## V

Industrial and International next argue they should be relieved of liability because the PUD's did not prove at trial that the insureds actually committed the acts alleged in the MDL 551 case. They assign error to the following jury instruction:

> Plaintiffs have the burden of proving, by a preponderance of the evidence, all of the facts necessary to establish their claim for coverage under each of its insurance policies. To meet this burden with respect to policies in effect during a policy period, Plaintiffs must prove that they satisfied the terms and conditions of coverage and *establish the existence of an occurrence or occurrences resulting in loss during the policy period.*

(Italics ours.) Clerk's Papers, at 1501 (instruction 4). The Defendants claim that this instruction is inadequate for the jury to determine whether the insureds were actually liable to the MDL 551 claimants.

International and Industrial contend that in order for coverage to exist in this case, the PUD's have to prove that the claims fell within coverage of the policy and that the individual officers and employees actually committed the acts that would give rise to liability under the policies. Without this proof, they argue, Plaintiffs are not entitled to collect.

In support of this argument, they cite *Kagele v. Aetna Life & Cas. Co.*, 40 Wn. App. 194, 698 P.2d 90, *review denied*, 103 Wn.2d 1042 (1985), a case in which the insured party settled by assigning its rights under the policy to the injured party. When the assignee sought to enforce its claim against the insurer, the *Kagele* court stated that

> as a condition precedent to recovery against the insurer, the injured party would have to prove the claim was within the coverage of the policy.

(Citation omitted.) *Kagele*, 40 Wn. App. at 199.

The Plaintiffs claim, however, that because this is a case to enforce a settlement, they need only prove that the allegations in the MDL 551 claims would have been covered by the policies. They also assert the underlying claims are within coverage of the policies. For this they rely on our holding in *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists. Util. Sys.*, 111 Wn.2d 452, 760 P.2d 337 (1988), where we found that the MDL 551 allegations would trigger liability under the Transcontinental policies, the policies underlying both the International and the Industrial policies in this case. *See Transcontinental*, 111 Wn.2d at 470.

We cannot ignore the similarities of this case to *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485 (5th Cir. 1992). Enserch's subsidiary, Ebasco, like the PUD's and the individuals in this case, was a defendant in MDL 551. As part of its settlement, Ebasco, like the PUD's in this case, received an assignment of insurance proceeds. In an indemnification action, Ebasco attempted to collect these proceeds from the insurers. The *Enserch* court found that in an action to collect insurance proceeds after a settlement, payment is proper as long as the claim is shown to be within the scope of policy coverage. *Enserch*, 952 F.2d at 1493-94.

We agree and hold that the Plaintiffs, in this action to collect insurance proceeds under the settlement agreement, need only prove the underlying claims were covered by the policies — an issue we addressed in the *Transcontinental* case and have further explored earlier in this opinion. To require claims to be actually proved in an action to enforce a

settlement and collect insurance proceeds would defeat the purpose of settlement agreements. The MDL 551 settlement was reached in part to avoid lengthy and difficult litigation of these very issues.

We also reject the Defendants' argument that the trial court erred when it failed to instruct the jury that it must allocate the settlement between covered and noncovered claims. As we noted in *Transcontinental* the claims based on intentional acts of the individuals (which are not covered) and the claims based on negligence (which are covered) consist of the same factual core and, thus, require no allocation by the jury. *See Waite v. Aetna Cas. & Sur. Co.*, 77 Wn.2d 850, 856, 467 P.2d 847 (1970); *Prudential Property & Cas. Ins. Co. v. Lawrence*, 45 Wn. App. 111, 121, 724 P.2d 418 (1986). Likewise, the damages arising from both the noncovered claims and the covered claims are the same and cannot be separated or allocated. The trial court correctly kept this issue from the jury.

## VI

The trial court awarded prejudgment interest in excess of $6,500,000. International and Industrial challenge this assessment, arguing that the award was improper because the claims were unliquidated.

The award of prejudgment interest is proper when the nature of the underlying claim is liquidated. *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A claim becomes liquidated if its amount is readily determinable and it is possible to determine the exact amount without reliance on opinion or discretion. *Hansen v. Rothaus*, 107 Wn.2d 468, 472, 730 P.2d 662 (1986).

International and Industrial argue that the underlying claim of the MDL 551 claimants was unliquidated because, if that case had proceeded in trial, the jury would have had to engage in inexact computation regarding the damages award to which they were entitled. While the underlying claim may have been unliquidated as to the liability of the PUD's, the nature of the underlying claim does

not determine the nature of the settlement. As to the insurance carriers whose policy limits were set, however, the claims became liquidated at the time the settlement was reached. *See King Cy. v. Puget Sound Power & Light Co.*, 70 Wn. App. 58, 62-63, 852 P.2d 313, *review denied*, 122 Wn.2d 1017 (1993). We find a settlement made in an underlying civil action represents a liquidated amount and an award of prejudgment interest is appropriate.

## VII

The Defendants next challenge evidentiary and procedural rulings made by the trial court.

## A

### Disqualification of Counsel

The Defendants claim the trial court erred in denying their motions to disqualify attorney Albert Malanca and his firm, Gordon, Thomas, Honeywell, Malanca, Peterson and Daheim, on the ground that they would be necessary witnesses. Mr. Malanca was integrally involved in drafting the individuals' settlement agreement during the MDL 551 litigation, and the Defendants wanted to call him as a witness to these events.

The trial court denied the Defendants' early motions to disqualify Malanca because it reasonably found the same evidence was available from other sources. When that evidence was not forthcoming, however, the Defendants renewed their motion for disqualification just a few days before trial. The trial court refused to grant the Defendants' renewed motion at this late date, and instead ruled that Malanca could continue as counsel, but that International and Industrial were entitled to call him as a witness.

The court based its ruling on RPC 3.7 which provides:

> A lawyer shall not act as advocate at a trial in which the lawyer or another lawyer in the same law firm is likely to be a necessary witness except where:
>
> . . . .
>
> (c) The lawyer has been called by the opposing party and the court rules that the lawyer may continue to act as an advocate; or

(d) The trial judge finds that disqualification of the lawyer would work a substantial hardship on the client and that the likelihood of the lawyer being a necessary witness was not reasonably foreseeable before trial.

When interpreting these provisions, courts have been reluctant to disqualify an attorney absent compelling circumstances. *See Smithson v. United States Fid. & Guar. Co.*, 186 W. Va. 195, 199, 411 S.E.2d 850 (1991); *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 105-06, 624 P.2d 296 (1981).

When an attorney is to be called . . ., a motion for disqualification must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client.

*Cottonwood*, 128 Ariz. at 105. *Accord Smithson*, 186 W. Va. at 201.

At the time of the Defendants' first motion, they were unable to establish that the evidence to be provided by Mr. Malanca was otherwise unobtainable. The record indicates similar testimony was available from other sources, including Melvyn I. Weiss, a New York attorney involved in MDL 551, Everett B. Clary, a Los Angeles attorney who represented many Defendants in MDL 551, and Benjamin H. Settle, local counsel for several PUD's. We cannot find this denial in error.

At the time of their renewed motion just a few days before trial, the court noted the continued availability of much of the information, but recognized that Mr. Malanca may nonetheless be a necessary witness. The court also expressed valid concern regarding the potential prejudice to the Plaintiffs if their counsel was disqualified as well as the potentially unseemly tactics involved in such a late motion. Under the circumstances, we find the trial court's ruling under RPC 3.7 to be an appropriate compromise, balancing the interests of both the Plaintiffs and the Defendants. We find no abuse of discretion.

## B

## Refusal To Grant a Continuance

The Defendants contend the trial court erred in denying their motion for a continuance, while the Plaintiffs counter that the trial court properly decided to enforce the discovery schedule and maintain the scheduled trial date. We review a trial court's denial of a continuance for abuse of discretion. *Layne v. Hyde*, 54 Wn. App. 125, 130, 773 P.2d 83, *review denied*, 113 Wn.2d 1016 (1989); *Bennett v. Bennett*, 63 Wn.2d 404, 416, 387 P.2d 517 (1963).

The Defendants moved for a continuance on the ground that they needed additional time to complete crucial discovery. The Plaintiffs, however, contend that the Defendants' own dilatory conduct led to their discovery predicament.

Although the record reveals a series of discovery disputes between the parties, we cannot say the trial court erred in refusing to continue the trial. As it was, the trial was not commenced until 3 years after the complaint was filed. The trial court appointed a special discovery master and met with the parties to monitor discovery progress. The trial court has the authority to manage discovery and, in this case, was familiar with the circumstances prior to trial.

Reversal and order for a new trial is a severe measure and should be reserved for more extreme cases. We find no abuse of discretion.

## C

## Evidence of Actual Prejudice

The Defendants claim the trial court erred in excluding testimony they sought to admit on the issue of actual prejudice.

Admission of evidence is well within the trial court's discretion. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107, 864 P.2d 937 (1994). It is well established that the trial court may properly exclude evidence which would have a tendency to mislead, distract, confuse, waste time, or be too remote. Such rulings will not be disturbed on appeal absent .

a showing of abuse of discretion. *Roberts v. ARCO*, 88 Wn.2d 887, 568 P.2d 764 (1977).

The trial court declined to allow the testimony of defense witness, Ken Houtz, who was prepared to testify about how other insurers handled their settlements in the MDL 551 claims. The trial court found that because the other insurers had different policies with different terms, reference to those policies would tend to confuse the issues of the case rather than be relevant to the issue of actual prejudice to the Defendant insurers.

The trial court also limited the testimony of the Defendants' expert witness Allan Windt. While Mr. Windt was permitted to testify generally about what causes an insurer to be prejudiced, he was not permitted to testify specifically regarding what the insurers would have done had they been directly involved in the MDL 551 settlement negotiations. Because Mr. Windt did not have firsthand knowledge, the trial court ruled that such testimony would be speculative.

■ Thus, the trial court excluded testimony it found to be speculative and irrelevant, and, as noted above, the court provided cogent reasons, which are supported by the record, for its rulings. We find no abuse of discretion. ·

## VIII

In a separate appeal consolidated in this court, International and Industrial challenge the trial court's award of approximately $2.8 million in attorney fees, arguing that the award is improper because the policies do not provide for attorney fees and, alternatively, that the amount of the award is unreasonable. When reviewing an award of attorney fees, considerations relevant to our inquiry are whether the prevailing party was entitled to attorney fees and whether the award of fees was reasonable. *See Bowles v. Department of Retirement Sys.*, 121 Wn.2d 52, 70-71, 847 P.2d 440 (1993); *Allard v. First Interstate Bank*, 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989).

Generally attorney fees are not recoverable in the absence of a contract term or statute allowing for their recovery. We

have recognized in the insurance context, however, that "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees," whether or not the insurance policy contains a provision for such fees. *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 54, 811 P.2d 673 (1991). *Accord Estate of Jordan v. Hartford Accident & Indem. Co.*, 120 Wn.2d 490, 508, 844 P.2d 403 (1993).

▮▮▮ We cannot authorize the imposition of attorney fees, however, when an insured has undisputedly failed to comply with express coverage terms, and the noncompliance may, extinguish the insurer's liability under the policy. By settling the MDL 551 claims without the consent of their insurers, the insureds in this case took actions inconsistent with the express coverage terms of their policies. Although we have found they are nonetheless entitled to the insurance proceeds because the insurers were not actually prejudiced by their noncompliance, we cannot justify an attorney fees award under these circumstances.

We, therefore, reverse the trial court's attorney fee award and, likewise, reject the Plaintiffs' request for attorney fees and costs on appeal.

## IX

In summary, we affirm in part and reverse in part. As to the underlying verdict and judgment, we affirm the trial court and find: (1) the International policy provides coverage for the MDL 551 claims, as does the Industrial policy; (2) the insureds' assignment of the insurance proceeds does not extinguish the Defendants' obligations under the policies; (3) the trial court did not err in submitting the issue of actual prejudice to the jury; (4) the jury instruction regarding the known risk defense is not in error; (5) in an action to collect insurance proceeds after a settlement, payment is proper as long as the claim is shown to be within the scope of policy coverage; (6) the trial court did not err in awarding prejudgment interest; (7) the trial court's evidentiary and pro-

cedural rulings do not constitute an abuse of discretion. We reverse the trial court's award of attorney fees.

ANDERSEN, C.J., and BRACHTENBACH, SMITH, GUY, and MADSEN, JJ., concur.

JOHNSON, J. (concurring in part, dissenting in part) — I disagree only with the majority's reversal of the attorney fee award.

The general legal rule on attorney fees in the insurance context is correctly stated by the majority. The majority then determines as a factual matter no attorney fees are justified here. I disagree.

UTTER, J., concurs with JOHNSON, J.