98 F.3d 1346
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Paul S. RANES, M.D., Plaintiff-Appellee,
v.
The PAUL REVERE LIFE INSURANCE COMPANY, Defendant-Appellant.
 No. 95-35575, 95-35801.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Oct. 1, 1996.
 
 Before: REAVLEY,* REINHARDT and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 In this diversity suit under Washington law, appellant Paul Revere Life Insurance Company (Paul Revere) appeals a judgment entered against it by the district court, after a trial to the bench with an advisory jury. The court ruled that appellee Paul Ranes was entitled to disability insurance coverage under a Revere policy. We affirm.
 
 BACKGROUND
 
 3
 In 1988 Ranes was a practicing surgeon in the Seattle area. On January 3, 1989, he met with David Peterson of the Doctors' Company, an insurance broker. Peterson sold no disability policies except those of Paul Revere. Ranes filled out an application for disability insurance on a Paul Revere application form. The application contains a clause, which Paul Revere calls the "good health" clause, stating that "[t]he insurance applied for will not take effect unless the issuance and delivery of the policy and payment of the first premium occur while the health of the Proposed Insured remains as stated in the Application." The application also stated, in bold print below the signature line, that "[a]pplicants will be informed whether or not their application has been accepted within 60 days or be given the reason for any further delay." On the same day Ranes submitted a check for the first month's premium.
 
 
 4
 On January 4, Peterson wrote Ranes to inform him that Peterson had ordered a para-medical exam for the purpose of completing part two of the application. The exam was to be performed by Physical Measurements, Inc., an examiner chosen by Peterson from a list that Paul Revere authorized to perform examinations. Although Paul Revere argues that there is no evidence in the record that Physical Measurements was affiliated with Paul Revere, the January 4 letter does state that Peterson wanted "to thank you for the confidence you have placed in the Doctors' Company and the Paul Revere Life Insurance Company." The letter also stated that Peterson had found out that Paul Revere requires payment of the first two months of premiums "to bind the coverage." Ranes provided a second check to Peterson.
 
 
 5
 The medical exam did not occur until January 26, 1989. Ranes claimed that he played no role in scheduling the examination. At the exam Ranes revealed that he had suffered from iritis--an inflammation of the front part of the eye--"on and off for 25 years." Ranes identified Dr. Nielsen as his ophthalmologist.
 
 
 6
 Paul Revere's Seattle office did not receive the medical examination report until February 2, and did not forward the application to the home office until February 7. On February 13, an underwriter at the home office decided that an "attending physician report" from Dr. Nielsen was needed. Nielsen received a blank attending physician report, a one-page document, on February 28. Dr. Nielsen saw Dr. Ranes on February 23 and March 2. He completed the form and returned it to a service company designated by Paul Revere the day after receiving it. The completed report was returned to the home office on March 10. On March 15, the underwriter developed two coverage options based on the report, one offering only one year of coverage for disability to the eyes, and the second offering full coverage at a higher premium. Paul Revere communicated these options to Peterson on March 21, and Peterson discussed the options with Ranes on March 24. Through what Paul Revere characterizes as a miscommunication, Peterson told Ranes that the first option, chosen by Ranes, applied only to iritis.
 
 
 7
 Meanwhile, on March 6, 1989, Ranes was examined by a Dr. McLean. Nielsen had referred Ranes to McLean. Ranes underwent a fluorescein angiogram, and on March 8 McLean and Ranes reviewed the results of the angiogram. An eye condition more serious than iritis, choroidal neovascularization ("CNVM"), was indicated. The district court found, and Paul Revere does not dispute on appeal, that this diagnosis was for a new condition "unrelated to iritis, which was not present on March 2, 1989," when Dr. Nielsen had examined Ranes. Nielsen's attending physician report did not indicate CNVM.
 
 
 8
 The policy was issued on or about March 28. Paul Revere later wrote a letter to Ranes interpreting the policy's eye exclusion only to apply to iritis. Paul Revere argues that it would not have issued this letter if Ranes had informed it of his recent diagnosis for CNVM.
 
 
 9
 In August of 1990, Ranes' eyesight had deteriorated to the point where he could not continue his practice, and he applied for disability benefits under the policy. His claim was denied by Paul Revere on grounds that his health had changed during the application process. During the application period Ranes had canceled an existing disability policy and sought no coverage elsewhere.
 
 
 10
 The case was tried to the court with an advisory jury. After the jury reached a verdict finding for the plaintiff, the district court entered findings of fact, conclusions of law, and a final judgment in favor of Ranes. The district court concluded that Paul Revere had unreasonably delayed the processing and delivery of the policy, and was therefore estopped from denying coverage based on a change in Ranes' health during the application period.
 
 DISCUSSION
 A. Unreasonable Delay
 
 11
 The district court followed Washington law as this court interpreted it in a prior appeal. The district court had earlier entered a summary judgment in favor of Paul Revere, on grounds that his health had changed between the time of the application and the time that the policy issued, in contravention of the good health clause. We agreed with Paul Revere that "Ranes had a change in health--namely, the development of choroidal neovascularization causing decreased vision--between the time he applied for insurance and the time Revere delivered the policy." Ranes v. Paul Revere Life Ins. Co., 32 F.3d 1393, 1397 (9th Cir.1994). However, we held that summary judgment was inappropriate because a fact issue had been raised on whether Revere should be estopped from denying coverage due to unreasonable delay in processing the application. Id. at 1398-99. We further held that whether a delay is unreasonable is a question of fact. Id. at 1398.
 
 
 12
 Following our remand, the district court considered the evidence of delay and found that Paul Revere had unreasonably delayed in processing and delivering the policy. That finding of fact is reviewed under the clearly erroneous standard. Lam v. University of Hawai'i, 40 F.3d 1551, 1564 (9th Cir.1994).
 
 
 13
 The district court's finding of unreasonable delay is not clearly erroneous. Almost three months expired between the time that Ranes filled out the application and the time the policy issued. In our prior opinion we cited Dyer v. Missouri State Life Ins. Co., 232 P. 346 (Wash.), affirmed on rehearing, 236 P. 807 (Wash.1925), in our discussion of estoppel. There, the Washington Supreme Court held that a delay of seventeen days in processing a life insurance application was unreasonable.
 
 
 14
 In the application Ranes prepared and signed on January 3, 1989, Revere promised that "[a]pplicants will be informed whether or not their application has been accepted within 60 days or be given the reason for any further delay," but did not inform Peterson of its conditional acceptance of the application until more that two weeks after its own self-imposed deadline. Moreover, Ranes' change in health also occurred after this 60-day period, as his CNVM was not diagnosed until March 8, 1989. Paul Revere does not challenge the district court's conclusion that Peterson acted as Paul Revere's agent or with Paul Revere's apparent authority. On this record the district court could reasonably conclude that Ranes was not responsible for the time it took to process the application, that Revere controlled the application process, and that delays were due either to Paul Revere or Paul Revere's agents (Peterson, the service company hired to obtain the attending physician's statement, and/or the examiner hired to complete the initial medical examination). As examples, Ranes offered evidence that the local Revere office frequently requests an attending physician's statement where it is obvious that one will be needed, rather than waiting for the home office to order the statement, as happened here. Although the initial application was prepared on January 3, the medical exam, which only took about half an hour, did not occur until January 26, 1989. Although the local office had parts one and two of the completed application on February 2, Nielsen did not receive the attending physician statement form to fill out until February 28, and this report was not acted on by the underwriter until March 15.
 
 
 15
 Paul Revere suggests that expert testimony was required to show unreasonable delay on its part. We are not persuaded by this argument. Paul Revere cites no compelling authority that expert testimony is required in this context. In Dyer, discussed above, the court upheld a jury verdict finding that the insurer negligently failed act with due promptness on an insurance application, even though there was no expert testimony offered. Further, in our prior panel opinion we concluded that a genuine issue of material fact had been raised on the issue of unreasonable delay despite the absence of expert testimony in the record. Since there is no issue for trial and summary judgment is mandated "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), our prior panel necessarily, if implicitly, held that expert testimony was not required on this issue at trial.
 
 
 16
 Paul Revere also complains that in addition to offering no evidence of industry practice, Ranes did not offer any evidence of how Revere had handled similar applications, as was done in Dyer. Again, while such evidence might have been helpful, we are not persuaded that it was essential.
 
 B. Attorney's Fees
 
 17
 Revere argues that the district court also erred in awarding attorney's fees. In Olympic Steamship Co. v. Centennial Ins. Co., 811 P.2d 673 (Wash.1991), the Washington Supreme Court held that "an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract, regardless of whether the insurer's duty to defend is at issue." Id. at 681.
 
 
 18
 The Washington Supreme Court later described the Olympic Steamship rule as a "narrow exception" to the American rule that each side to a suit ordinarily bears its own attorney's fees, and denied fees in a case where the insurer had assumed coverage and the litigation only concerned the value of the claim. Dayton v. Farmers Ins. Group, 876 P.2d 896, 898 (Wash.1994). However, our court has held that the Olympic Steamship rule "has been read broadly by Washington courts, even to include cases in which there is no contractual basis for the awarding of fees," and that "[t]he only articulated limitation to this rule is that no fees are awarded when the insurer does not dispute coverage, but merely disputes the value of the claim." Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1437 (9th Cir.1995) (citing Dayton ). As between Olympic Steamship and Dayton, our case falls within the Olympic Steamship rule, since Revere denied coverage in its entirety.
 
 
 19
 In Public Utility Dist. No. 1 v. International Ins. Co., 881 P.2d 1020 (Wash.1994) (PUD ), the insureds had settled certain claims and then sought coverage under their insurance policies. The insurers argued that they were not obligated under the policies because the insureds had violated express terms in the policies, prohibiting the insureds from settling claims without the consent in the insurers. The court held that a breach of this policy provision only released the insurers from their coverage obligations if they were prejudiced by the settlement of the claims without their consent, and that there was no prejudice. The court did, however, reverse the award of attorney's fees, reasoning:
 
 
 20
 We cannot authorize the imposition of attorney fees, however, when an insured has undisputedly failed to comply with express coverage terms, and the noncompliance may extinguish the insurer's liability under the policy. By settling the [claims] without the consent of their insurers, the insureds in this case took actions inconsistent with the express coverage terms of their policies. Although we have found they are nonetheless entitled to the insurance proceeds because the insurers were not actually prejudiced by their noncompliance, we cannot justify an attorney fees award under these circumstances.
 
 
 21
 Id. at 1034-35.
 
 
 22
 While the issue is not free from doubt, we are persuaded that the Washington Supreme Court would allow the recovery of attorney's fees in our case under Olympic Steamship, viewing it as one "where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract...." 811 P.2d at 681. PUD is distinguishable, because there the insureds intentionally settled their claims without the consent of the insurer, in contravention of the express terms of the policy, and prevailed on their coverage dispute only because of the court's finding that the insurers had not been prejudiced by the breach of the policy. Here, Ranes did not intentionally breach any express terms of the policy. The "good health" clause is found not in the policy itself, but in the application. We previously described the clause not as a contractual promise or obligation of the insured, but in the nature of a condition precedent to the formation of the contract. Ranes, 32 F.3d at 1395, 1399 n. 2. Further, the district court found that "[i]n all aspects of the transaction, [Ranes] proceeded in good faith and was free from fault." This finding in not clearly erroneous. In these circumstances we conclude that Washington common law allows for the recovery of attorney's fees.
 
 
 23
 AFFIRMED.
 
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3