**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

August 29, 2023

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ARMED CITIZENS' LEGAL DEFENSE NETWORK, | No. 57043-2-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| WASHINGTON STATE INSURANCE COMMISSIONER, | |
| Respondent. | |

CHE, J.—Armed Citizens' Legal Defense Network (ACLDN) appeals the trial court's order affirming an Office of the Insurance Commissioner (OIC) order granting summary judgment for OIC and fining ACLDN $50,000 for unlawfully transacting insurance.

ACLDN is a for-profit Washington corporation. ACLDN offers memberships that include, among other benefits, financial assistance to members for legal expenses incurred as a result of a self-defense incident. RCW 48.01.040 states, "Insurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies."

In March 2020, the OIC served a cease and desist order on ACLDN requiring that ACLDN cease selling its memberships in Washington without having the necessary authority. The OIC later imposed a $200,000 fine for violating Washington's insurance laws. ACLDN appealed the OIC's order to OIC's hearing unit, and both parties filed for summary judgment. The presiding officer denied summary judgment for ACLDN but granted summary judgment for

No. 57043-2-II

OIC. The presiding officer concluded that ACLDN transacted insurance without the necessary authority and ordered ACLDN to pay a $50,000 fine. The superior court affirmed.

We hold that (1) ACLDN contracted with members to provide funds for members' legal expenses, (2) ACLDN undertook to indemnify or pay a specified amount of members' legal expenses, (3) self-defense and the resulting legal expenses incurred after an incident of self-defense are determinable contingencies, (4) ACLDN fails to provide any meaningful argument concerning whether RCW 48.01.040 is unconstitutionally vague beyond a reasonable doubt, and (5) ACLDN fails to demonstrate that SUBSTITUTE S.B. 5810 (S.S.B. 5810), LAWS OF 2023, ch. 3, § 1, applies in this appeal. Consequently, we affirm.

FACTS

A.    *Background*

ACLDN was formed in June 2011 as a Washington for-profit corporation. ACLDN is not authorized to operate as an insurer in Washington. ACLDN is comprised of over 17,000 members.

In its online advertising, ACLDN describes itself as "an organization of gun owners pooling their strength to protect one another when a member comes under scrutiny of the legal system after acting in self defense." Admin. Rec. (AR) at 316. ACLDN is "committed to the defense of its members should they be involved in a self-defense incident." AR at 280. ACLDN's website describes the organization's

> two core missions: first, to help members in the legal fight after they justifiably use force in self defense by paying for the services of attorneys, expert witnesses, private investigators and other professionals essential to mounting a vigorous legal

2

No. 57043-2-II

> defense of self defense on behalf of our members. Our second mission is educating our members (and to some extent, the gun-owning public) in the law governing use of force in self defense and how armed citizens can protect against unmeritorious prosecution.

AR at 317.

Following a self-defense incident, ACLDN provides financial assistance for a member's legal expenses through the ACLDN's Legal Defense Fund (Fund). The Fund receives "25% of all Network membership dues and renewals, plus 100% of corporate donations, estate and bequest gifts, and personal contributions." AR at 336. The Fund contains over $2,000,000 and has been used to fund 22 members' legal expenses following an incident involving self-defense. The amount expended by ACLDN on each member's claim varied, ranging from $400 to $75,000. Of the 22 members that have received funds from ACLDN, one was in Washington. In that case, ACLDN provided $2,000 to the member for legal expenses. ACLDN declined to provide funds in three instances, including one instance in Washington.

ACLDN's membership brochure encourages individuals to join the network and not "face the legal aftermath of self defense alone." AR at 262. In order to join the organization, prospective members must select a membership term length and pay a membership fee. The membership brochure states that "members receive financial assistance to assure vigorous legal representation after using deadly force in self defense. [Members] can rely on the Network leadership, attorneys and legal experts for knowledgeable assistance and guidance." AR at 261. The brochure further explains that "[w]hen a member uses force in self defense, the Network immediately sends up to $25,000 to the member's attorney and can provide up to $25,000 in bail

3

No. 57043-2-II

assistance.[1]  This assistance is extended after any legal self-defense incident whether [a member] use[s] a firearm or other defense option."  AR at 262.  ACLDN makes clear that its financial assistance "pays attorney fees and if needed, the expertise of an additional attorney or attorneys . . . as well as pay[s] for expert witnesses, private investigators and other expenses to defend the member's self-defense actions," including "legal funding to defend against [a] civil law suit," retrial, or appeal.  AR at 262.  ACLDN's brochure provides an explicit disclaimer that "membership benefits are not insurance reimbursements."  AR at 262.

After joining ACLDN, members receive an "Explanation of Member Benefits."  AR at 264 (most capitalization omitted).  ACLDN explains that members will receive educational materials, "access to listings for Network Affiliated Attorneys," an initial attorney fee deposit in incidents of self-defense, and bail assistance "upon a showing of legal self defense."  AR at 264-65.  When a member requests additional funding "to defray the cost of going to trial," ACLDN's "Advisory Board will review the facts of the case and advise [ACLDN] leadership on specific issues of legal self defense on which decisions to grant financial support rest."  AR at 265.

---

[1] ACLDN alleged that it removed the "'up to $25,000'" language from its website before the OIC's enforcement action and claims that it no longer specifies the amount of funding it provides members.  Reply Br. of Appellant at 15.  The record does not show when ACLDN removed this language; however, the language is present in the materials provided to the presiding officer as part of the administrative record.  Furthermore, the OIC issued a notice of investigation to ACLDN on April 15, 2019, a subpoena for all documents available to members related to the Fund and member benefits on June 26, 2019, and a cease and desist order on March, 26, 2020.  AR at 239, 252, 38 (capitalization omitted).  ACLDN responded to the OIC's subpoena by "providing the materials . . . available to prospective, new, and renewing members."  AR at 258.  In its cease and desist order, the OIC explained that it had obtained ACLDN's advertising and membership materials.  The materials contained the "'up to $25,000'" language.  AR at 39.

No. 57043-2-II

ACLDN explains that its review process "is never undertaken to deny assistance to a member who acted in legitimate self defense, but rather to prevent accusations that the [ACLDN] supports or encourages use of force without justification." AR at 265.

ACLDN's online materials reiterated that it is not insurance or a pre-paid legal service plan. ACLDN explains that it pays a fee deposit to a member's attorney

> to ensure a member has legal representation immediately after an incident, and that the member's attorney can pull out all the stops in protecting the member's rights, including being with the member during contact with law enforcement, hiring a private investigator . . . keeping the news media away . . . , and other services as may be needed.

AR at 273. ACLDN does not require members to repay the fee deposit paid to their attorney.

Furthermore, where "charges are not dropped or if a grand jury is convened," ACLDN will ask the member's counsel "to estimate how much money is needed to prepare for and go to trial." AR at 345. Once the question of cost is settled, ACLDN "will fund the entire defense, assuming no new evidence has surfaced that invalidates the self-defense claim." AR at 345-46. ACLDN does not automatically pay a set amount to a member's attorney, instead ACLDN works with the member's attorney to ensure that ACLDN provides a sufficient retainer. ACLDN explains that membership benefits apply "to any justifiable use of force." AR at 321 (underline omitted). Receipt of funding "is subject to a review of the facts of the case as known at the time and a determination [that] it was a legitimate act of self defense." AR at 336. Members "are entitled to case review by one of the [ACLDN's] experts." AR at 336.

A grant of bail assistance is also subject to ACLDN's review. Before providing funding for bail expenses, ACLDN requires sufficient evidence that the member's use of force was for

5

No. 57043-2-II

self-defense. ACLDN cautions members "that assistance with posting bail may not meet in full the requirements of the bail bonding agent, and in all likelihood will require financial participation from the member, as well." AR at 342.

B.      *OIC Investigation and Administrative Proceedings*

In April 2019, after reviewing ACLDN's website, the OIC's regulatory investigations unit formally began investigating ACLDN.[2] In March 2020, the OIC issued a cease and desist order to ACLDN. The order required that ACLDN cease selling its memberships in Washington without having the necessary authority. ACLDN moved to stay the OIC's cease and desist order, but the presiding officer denied the motion. In May 2020, the OIC issued an order imposing a $200,000 fine against ACLDN for violating Washington's insurance laws. Both parties filed demands for hearings with the OIC's hearings unit concerning imposition of a fine and the cease and desist order. The hearings unit's presiding officer consolidated the hearings.

Subsequently, both parties moved for summary judgment. In support of ACLDN's opposition to the OIC's motion for summary judgment, 13 of ACLDN's members[3] submitted declarations stating that "[a]t no time did [the member] think or believe that ACLDN was

---

[2] The OIC's investigation of ACLDN was part of a string of investigations into similar membership organizations. Of note, the OIC investigated Lyndon Southern Insurance Company (Lyndon) for its provision of prepaid legal services to members who use a weapon in a self-defense incident. The OIC levied a fine against Lyndon because the company's policy potentially covered illegal acts. After revising the language of its policy, Lyndon received the OIC's approval for its firearms legal defense insurance program.

[3] In its briefing to this court, ACLDN alleged that "[d]ozens of members filed declarations." Br. of Appellant at 26. However, the record before this court contains only 13 member declarations.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 57043-2-II

providing [them], as a member, insurance or contractual obligation to have access to the ACLDN fund." AR at 650. In September 2020, the presiding officer issued a Final Order on Summary Judgment; however, the record remained open to allow for briefing regarding the fine amount.

In November 2020, the presiding officer entered a Second Amended Final Order on Summary Judgment (Final Order) granting summary judgment for OIC and denying the same for ACLDN, concluding (1) ACLDN's promise to pay either "'up to $25,000,'" a "'legal expense,'" or a 'bail expense'" qualified as a specified amount; (2) the act of self-defense is determinable and the circumstances that precede a decision to act in self-defense is contingent, which made it a determinable contingency; (3) ACLDN's disclaimer that membership "is not insurance," along with its other materials and advertisements did not alter the relationship it created between insurer and insured; and (4) ACLDN memberships qualified as insurance under RCW 48.01.040. Clerk's Papers (CP) at 24-28. Having determined that ACLDN transacted insurance without a certificate of authority, the presiding officer concluded that the OIC had authority to issue a cease and desist order and to impose a $50,000 fine.

ACLDN sought judicial review. On review, the superior court determined that (1) a contract exists between ACLDN and its members, (2) "the amounts specified are the categories of legal expense or bail expense" and that such categories are "specific enough to satisfy the definitional standards" of insurance, (3) in the alternative, ACLDN undertakes to indemnify its members "where members are contracting for reimbursement for legal expenses or bail expenses," and (4) an act of self-defense, although an intentional act, is a determinable

7

No. 57043-2-II

contingency. CP at 49-50. The superior court affirmed the presiding officer's Final Order and ACLDN appeals.

ANALYSIS

I. STANDARD OF REVIEW

The Administrative Procedure Act (APA) governs judicial review of the OIC's actions. *Chicago Title Ins. Co. v. Off. of Ins. Comm'r*, 178 Wn.2d 120, 133, 309 P.3d 372 (2013). Under the APA, we will only grant relief under certain circumstances, including where "[t]he agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(d). In reviewing an administrative action, we sit in the same position as the superior court and apply the APA standards directly to the agency's record. *Superior Asphalt & Concrete Co. v. Dep't of Lab. & Indus.*, 112 Wn. App. 291, 296, 49 P.3d 135 (2002). Under the APA, the party asserting invalidity of an agency action bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a).

"[W]here the original administrative decision was on summary judgment, the reviewing court must overlay the APA standard of review with the summary judgment standard." *Verizon Nw., Inc. v. Emp. Sec. Dept.*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). "Summary judgment is appropriate only where the undisputed facts entitle the moving party to judgment as a matter of law."[4] *Id.* Accordingly, we review facts in the record de novo and in the light most favorable to

---

[4] In its motion for summary judgment before the presiding officer, ACLDN acknowledged that "all material *facts* laid out in the OIC Order are undisputed" and that the "dispute here is purely legal, not factual." AR at 381-82.

8

No. 57043-2-II

the nonmoving party. *Id.* We further review legal conclusions under the "'error of law'" standard. *Id.*

Under the "'error of law'" standard, we may "substitute our view of the law for that of the Commissioner." *Id.* at 915. However, we give "substantial weight to an agency's interpretation of a statute within its expertise." *Id.*

## II. LEGAL PRINCIPLES

Under RCW 48.01.040, insurance "is [1] a contract [2] whereby one undertakes to indemnify another or pay a specified amount [3] upon determinable contingencies." The term "'insurance contract'" captures "a general and broad category of contracts that are both risk-shifting and risk-distributing devices." *Pope Res. LP v. Certain Underwriters at Lloyd's,* 19 Wn. App. 2d 113, 142, 494 P.3d 1076 (2021), *review denied*, 198 Wn.2d 1040 (2022). Generally, insurance is presented "in the form of a written 'policy'"; however, "there are a variety of contracts that may satisfy the definition of 'insurance' without resembling a traditional 'policy.'" *Id.*

## III. EXISTENCE OF A CONTRACT

ACLDN argues that its memberships cannot be considered a contract for insurance because ACLDN membership does not entitle members to financial assistance. ACLDN further argues that even where it declines to provide financial assistance for a member's lawful use of force, nothing in its membership agreements would allow a member to sue for financial assistance. We disagree.

9

No. 57043-2-II

Under RCW 48.01.040, "[i]nsurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." As noted above, a contract of insurance requires that "the agreement . . . be both a risk-shifting and risk-distributing device." *Pope*, 19 Wn. App. 2d at 142. "'A contract is a legally enforceable promise or set of promises.'" *Id.* at 141 (quoting 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 301.01, at 163 (7th ed. 2019)).

A contract requires an offer, acceptance, and consideration. *Christiano v. Spokane County Health Dist.*, 93 Wn. App. 90, 95, 969 P.2d 1078 (1998). If a party retains "an absolute right not to perform at all, there is an absence of consideration." *Felice v. Clausen*, 22 Wn. App. 608, 611, 590 P.2d 1283 (1979). Where "the provisions of an agreement leave the promisor's performance entirely within his discretion and control, the 'promise' is illusory." *Id.* We decline to "give effect to interpretations that would render contract obligations illusory." *Taylor v. Shigaki*, 84 Wn. App. 723, 730, 930 P.2d 340 (1997).

Here, ACLDN's brochure itself constitutes an offer to prospective members. The brochure explains that, among educational benefits, members also "receive financial assistance to assure vigorous legal representation after using deadly force in self defense." AR at 261. The brochure further provides that when members use "force in self defense, the Network immediately sends up to $25,000 to the member's attorney and can provide up to $25,000 in bail assistance." AR at 262. The brochure emphasizes that the "Network advantage is particularly apparent when we fund a trial team when the money's needed upfront to prepare and defend at trial." AR at 262. Similar language reiterates that ACLDN's "post self-defense support doesn't

10

No. 57043-2-II

end when the criminal trial is over." AR at 262. Instead, "[a]s a Network member . . . . benefits include legal funding to defend against [a] civil law suit, . . . . retrial or appeal." AR at 262. The brochure's language explicitly communicates ACLDN's offer to provide financial benefits to its members.

Members are invited to accept ACLDN's offer by completing the membership application attached to its brochure. In addition to providing background information and selecting a membership term length, members are required to provide payment information. Here, submitting the membership application, selecting the membership term length, and paying the membership fees serve as acceptance and consideration.

Furthermore, the agreement between ACLDN and its members is "both [a] risk-shifting and risk-distributing device[]." *Pope*, 19 Wn. App. 2d at 142. A portion of each member's dues is automatically deducted and deposited into the Fund. The Fund is then used "to provide legal defense support to . . . members after a self-defense incident." AR at 273. By "pooling resources to support one another's legal defense," the membership agreement between ACLDN and its members is a risk shifting and distributing device. AR at 337.

We do not accept ACLDN's position that any promise to provide financial assistance is illusory because ACLDN retains discretion to withhold funds. First, nothing in ACLDN's membership application brochure informs members that ACLDN retains funding discretion. Next, although ACLDN suggests that it maintains funding discretion, ACLDN exercises such discretion to determine only the lawfulness of the member's actions. For example, ACLDN explains that its review process "is in place to assure the Network that the . . . Fund is not wasted

11

No. 57043-2-II

defending a criminal act and that the member's actions were indeed justifiable." AR at 265. ACLDN explicitly provides that a "review is never undertaken to deny assistance to a member who acted in legitimate self defense." AR at 265. Nowhere in its materials does ACLDN disclose that it retains discretion to deny funds for a member's lawful act of self-defense.

Accordingly, we find a contract exits under these circumstances.

## IV. INDEMNIFICATION OR PAYMENT OF SPECIFIED AMOUNT

ACLDN argues that even if it decides to provide monetary support to its members, that support is not indemnification nor an agreement to pay a specified amount. We disagree.

Under RCW 48.01.040, an insurance contract requires that "one undertakes to indemnify another *or* pay a specified amount upon determinable contingencies." (Emphasis added.) Washington's insurance code does not define "indemnify" nor "specified amount." In the absence of these definitions, we give the terms their "plain and ordinary meaning[s] ascertained from a standard dictionary." *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004).

"Indemnify" means "to secure or protect against hurt or loss or damage," "to exempt from incurred penalties or liabilities," and "to make compensation to for incurred hurt or loss or damage." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1147 (8th ed. 2002). *New Appleman on Insurance* explains that "the term 'indemnity' refers to the compensation necessary to reimburse the insured's loss." 1 JEFFREY E. THOMAS & FRANCIS J. MOOTZ III, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 1.05(4) (2023). Where an insured "suffers a loss, the insurer pays proceeds, a benefit, to the insured in an amount that offsets the loss." *Id.*

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 57043-2-II

"Specify" means "to mention or name in a specific or explicit manner," or to "tell or state precisely or in detail." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2187. "Amount" means "the total number or quantity," or "the quantity at hand or under consideration." *Id.* at 72.

Here, ACLDN undertook to indemnify or pay a specified amount of its members' legal and bail expenses. First, ACLDN's webpage explained that the payment of membership fees "buy[s]" members "[a]n initial fee deposit of up to $25,000 paid to the member's attorney by the Network if the member has been involved in a self-defense incident." AR at 281. ACLDN expands on this language in its application brochure, explaining that in addition to attorney fees, ACLDN "can [also] provide up to $25,000 in bail assistance." AR at 262. In stating a specific dollar amount and tying payments to specific events, ACLDN's language demonstrates that it undertook to pay a specified amount of members' expenses.

Even in the absence of the "up to $25,000" language, ACLDN's website and materials provide language sufficient to establish that it undertook to pay a specific amount. Throughout its materials, ACLDN indicates that it will pay legal expenses associated with expert witnesses, private investigators, attorney fees, bail, civil law suits, retrials, and appeals. Although, not tied to a dollar amount, these categories of expenses provide sufficient detail to determine what costs ACLDN considers in providing funding.

Regardless of whether ACLDN undertook to pay a specified amount, ACLDN's materials suggest that it undertook to provide funding to its members, whether by making payments directly to its members or to a third party. Throughout its website and brochure, ACLDN emphasizes that it is "committed to the defense of its members." AR at 280. By

13

No. 57043-2-II

providing funding to its members throughout the various stages of litigation, ACLDN protects its members from the costs of litigation. Accordingly, ACLDN undertakes to provide funding for expenses to its members in self-defense actions.

V.  DETERMINABLE CONTINGENCY

ACLDN argues that "a lawful act of self-defense . . . is not a determinable contingency." Br. of Appellant at 26. ACLDN explains that it does not offer "financial resources for losses caused by a third-party; instead, whatever resources it may choose to provide are dependent entirely on the conscious choices made and the intentional actions undertaken by the member who chose to protect herself." Br. of Appellant at 52. We disagree.

Under RCW 48.01.040, insurance requires the occurrence of a "determinable contingency." "Determinable" means "capable of being determined, definitely ascertained, or decided upon." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 616. "Contingency" means, in pertinent part, "the condition that something may or may not occur," "the condition of being subject to chance," "an event or condition occurring by chance and without intent, viewed as possible or eventually probable, or depending on uncertain occurrences or coincidences." *Id.* at 493.

The "determinable contingency" requirement reflects insurance law's fundamental assumption of "fortuity." 1 THOMAS & MOOTZ, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 1.05(1). Deeply rooted in insurance law is the concept "that an insurer will not pay for a loss unless the loss is 'fortuitous,' meaning that the loss must be accidental in some sense."

No. 57043-2-II

*Id.* at § 1.05(2)(a). In analyzing fortuity, focus "is not on the fortuity of the *cause(s)* of the loss, but rather on the fortuity of the *loss itself.*" *Id.* at § 1.05(2)(b).

In Washington, the fortuity principle is analogous to the known loss principle. *Alum. Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 556, 998 P.2d 856 (2000). The known loss defense is grounded "on the principle that an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased." *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 124 Wn.2d 789, 805, 881 P.2d 1020 (1994). Under the known loss defense, courts "must determine whether a particular occurrence was expected by the insured before the insurance coverage was obtained." *Id.* However, because "[t]he knowledge that some loss may occur in the future is the driving force behind the purchase of insurance," such general knowledge does not preclude coverage. *Id.* at 808.

RCW 9A.16.020 defines when use of force is lawful. It states in relevant part:

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
> . . . .
> (3) Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary.

RCW 9A.16.020(3).

Here, the legal consequences of an act of self-defense are determinable contingencies. The consequences of an act of self-defense are determinable and manifest in the form of legal expenses, including bail costs and attorney fees. The contingency is defined at the time of the

15

No. 57043-2-II

contract, not at the time of the loss or claim for coverage. *Klickitat*, 124 Wn.2d at 805, 808. At the time of entering into a contract with ACLDN, members may have general knowledge that such expenses may occur; however, such general knowledge does not rise to the level of subjective knowledge required to preclude coverage.

The legal expenses incurred satisfies the plain meaning of determinable contingency. First, legal expenses are capable of being determined. In its materials, ACLDN explains that it will work with a member's attorney in reaching a fee agreement, will send up to $25,000 to the member's attorney, and can provide up to $25,000 in bail assistance. Next, incurring legal fees is contingent on the prosecutor's decision to bring criminal charges against the member or on a private party's decision to file a civil action against the member. Specifically, ACLDN's Fund is not implicated unless a legal expense is incurred, such as an attorney fee or a bail expense. However, if a prosecutor declines to pursue charges or a private party declines to file an action against the member, these expenses may not arise.

Next, characterizing self-defense as a determinable contingency is consistent with *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 776 P.2d 123 (1989). In *Grange*, our Supreme Court explicitly recognized that insuring acts of self-defense is possible. The court considered whether an insurance association had "a duty to defend its insured in a wrongful death action where the insured allegedly killed the decedent in that action in self-defense." 113 Wn.2d at 92. The court held that the insurance association did not have a duty to defend the insured under the specific language of the insured's insurance policies. *Id.* at 97. Both of the policies provided "coverage for an 'occurrence,' where bodily injury results from 'an accident.'" *Id.* at 95. The

16

No. 57043-2-II

language of the policies did not apply because the insured's act of self-defense was a deliberate act and because serious bodily injury was an expected result from the insured's standpoint. *Id.* at 99.

Although the insured's policy in *Grange* did not cover an act of self-defense, the court expressly recognized, "members of the public may wish to insure themselves from the cost of defending liability actions where the facts ultimately exonerate them, and that it would not violate public policy to permit an insurance company to defend an action where the insured is excused on the basis of self-defense." *Id.*[5] Although the court concluded that the specific policies in *Grange* did not cover the defendant's act of self-defense, the court's subsequent explanation made clear that such coverage was possible.

In light of the definition of determinable contingency and the court's language in *Grange*, self-defense and the resulting legal expenses are determinable contingencies under RCW 48.01.040. Furthermore, having determined that ACLDN contracted with its members and undertook to indemnify its members or pay a specific amount of members' legal expenses, we agree that the OIC did not err in finding that ACLDN transacted insurance as defined under RCW 48.01.040.

---

[5] Confirming the court's language in *Grange*, the OIC recently approved a firearms legal defense insurance program. Under the insurance agreement, the insurer provides legal services to members following any incident in which the member "either discharges or displays a weapon for the purpose of using the weapon to stop a threat." AR at 488.

17

No. 57043-2-II

## VI. DUE PROCESS RIGHTS

ACLDN argues that if we "conclude that membership in the Network . . . constitutes insurance in Washington . . . , it then follows that Washington's laws are so vague that persons of common intelligence must guess at their meaning." Br. of Appellant at 53. We do not decide whether RCW 48.01.040 is unconstitutionally vague.[6]

We will not consider an issue where the appellant fails to provide meaningful argument. RAP 10.3(a)(6); *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012). The "'[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *Mason*, 170 Wn. App. at 384 (alteration in original) (internal quotations omitted) (quoting *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012)).

Here, ACLDN asserts that if this court finds that membership in ACLDN's network constitutes insurance, then RCW 48.01.040 is vague. ACLDN further contends that "[t]here is simply no way that . . . [ACLDN], its members, or anyone else could have guessed that the . . . membership benefits qualify as insurance." Br. of Appellant at 54. Such conclusory statements do not amount to meaningful argument. Therefore, in the absence of meaningful argument, we decline to decide whether RCW 48.01.040 is unconstitutionally vague.

---

[6] A law "is unconstitutionally vague 'if it does not define the criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited, or if it fails to provide ascertainable standards of guilt to protect against arbitrary enforcement.'" *State v. Locklear*, 105 Wn. App. 555, 559, 20 P.3d 993 (2001) (quoting *State v. Groom*, 133 Wn.2d 679, 691, 947 P.2d 240 (1997)). Statutes are presumed constitutional; thus, "the party asserting unconstitutionality must show unconstitutionality beyond a reasonable doubt." *Id*.

No. 57043-2-II

VII. S.S.B. 5810: LEGAL SERVICE CONTRACTORS

In a statement of additional authorities, ACLDN refers us to S.S.B. 5810. ACLDN contends that under S.S.B. 5810, "the Washington Legislature clarified that prepaid legal service plans, like those . . . [ACLDN] offers, are specifically exempt from the definition of 'Insurance' under RCW 48.01.050." Statement of Additional Auth. at [1]. We disagree.

In 2022, the Washington legislature passed S.S.B. 5810,[7] "exempting certain prepaid services from insurance regulation." LAWS OF 2023, ch. 3.[8] S.S.B. 5810 states "[l]egal service contractors are not insurers under RCW 48.01.050 and legal service plans are not insurance under RCW 48.01.040." *Id.* at § 1(2).

S.S.B. 5810 defines "[l]egal service contractor" as "any person, entity, or group of persons, including associations, who does [sic] not engage in the practice of law or the business of insurance and who, for consideration, provides members with access to legal services through agreements with providing attorneys." *Id.* at § 1(5)(a).

Under S.S.B. 5810 a "[l]egal service plan" is

an arrangement between a legal service contractor and an individual or person or group of individuals or persons, whereby specified legal services may be provided to, or provided at discounted rates to members by providing attorneys in consideration of a periodic payment that does not constitute payment of attorney fees of any providing attorneys."

---

[7] S.S.B. 5810 was filed with the Secretary of State on March 27, 2023 after the legislature voted unanimously to override the governor's veto. FINAL B. REP. ON SUBSTITUTE S.B. 5810, 68th Leg., Reg. Sess. (Wash. 2023). S.S.B 5810 took effect on July 23, 2023. LAWS OF 2023, ch. 3.

[8] https://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bills/Session%20Laws/Senate/5810-S.SL.pdf?q=%2020230417084919.

No. 57043-2-II

*Id.* at § 1(5)(b).

Under S.S.B. 5810, a "[p]roviding attorney" is "an attorney licensed, in good standing, and eligible to practice law in this state who provides legal services under a providing attorney agreement in accordance with the terms of the legal service plan, and pursuant to an engagement agreement between the providing attorney and the member." *Id.* at § 1(5)(d).

A "[p]roviding attorney agreement" is "a written contract or agreement between a legal service contractor and a providing attorney under which the providing attorney renders and provides legal services to members of a legal service plan." *Id.* at § 1(5)(e).

"'A statute is presumed to operate prospectively unless the Legislature indicates that it is to operate retroactively.'" *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 223, 173 P.3d 885 (2007) (quoting *State v. T.K.*, 139 Wn.2d 320, 329, 987 P.2d 63 (1999)). This presumption is overcome where "'(1) the Legislature explicitly provides for retroactivity, (2) the amendment is curative, or (3) the statute is remedial.'" *Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wn.2d 205, 220 504 P.3d 796 (2022) (internal quotation marks omitted) (quoting *Densley*, 162 Wn.2d at 223). Furthermore, in determining whether a statute is retroactive we also look to the statute's purpose, language, and legislative history. *Id.* at 221.

Here, our legislature has not indicated that S.S.B. 5810 operates retroactively. Nothing in the plain language of S.S.B. 5810 suggests that it is retroactive. The bill's legislative history also fails to indicate any intention for the retroactive application of S.S.B. 5810. Also, ACLDN has not provided any authority supporting retroactive application of S.S.B. 5810 in this case.

20

No. 57043-2-II

Furthermore, even if S.S.B. 5810 was retroactive, ACLDN is not a "legal service contractor" nor are its memberships "legal service plans." The record does not indicate that ACLDN is an entity that, "for consideration, provides members with access to legal service through agreements with providing attorneys." LAWS OF 2023, ch. 3 at § 1(5)(a). Instead, ACLDN explicitly states that it is not "a pre-paid legal service plan." AR at 347. ACLDN does "not have any attorneys on staff or under contract to assign to handle [a member's] case." AR at 347. Although, ACLDN provides members "access to listings for Network Affiliated Attorneys," nothing in the record suggests that a "providing attorney agreement" exists between ACLDN and its affiliated attorneys. AR at 264.

Accordingly, ACLDN has not established that S.S.B. 5810 is applicable to the issues raised here.

CONCLUSION

We affirm.

Che, J.

We concur:

Maxa, P.J.

Lee, J.

21